200

THE STATE OF WASHINGTON, *Respondent,* v. CARLTON I. SEARS, *Appellant.*[1]

[1]Reported in 103 P. (2d) 337.

*Raymond W. Clifford* and *Ernest H. Campbell,* for appellant.

*Smith Troy, Albert D. Rosellini,* and *John S. Lynch, Jr.,* for respondent.

*Cosgrove, Terhune & Schlosstein, Joseph Kindall, Wettrick, Flood, O'Brien & Stuntz, Chester McCarthy,* and *John T. Dalton, amici curiae.*

JEFFERS, J.—This action was instituted by the prosecuting attorney of Thurston county to restrain defendant from committing certain acts in violation of Laws of 1939, chapter 221, p. 923 (Rem. Rev. Stat. (Sup.), § 5854-21 [P. C. § 7109-21] *et seq.*), known as the "unfair practices act."

The complaint sets up five purported causes of action, wherein five purported violations of the act are alleged to have taken place. The complaint alleges, generally, and as applicable to each cause of action, that defendant is an agent and salesman of Rexall Drug Company, a corporation, organized and existing under the laws of the state of Washington and having its sole place of business in Olympia, Washington, where it operates two stores, one on Fifth avenue and Capitol way, to which we shall refer as Rexall, and the other on Fourth avenue and Washington street, to which we shall refer as Security. It is further alleged that the merchandise referred to in each cause of action is a standard article of standard quality in the retail drug business; and that the acts done in each cause of action were done with intent and for the purpose of injuring competitors or destroying competition.

In the first cause of action, it is further alleged that defendant, at the Rexall store, offered for sale and sold Lucky Strike, Chesterfield, and Camel cigarettes, at the retail price of fifteen cents per package, or two packages for twenty-nine cents, and $1.39 per carton, whereas at the Security store, defendant offered for sale and sold the same brands of cigarettes for sixteen cents per package, or two packages for thirty-one cents, and $1.45 per carton; that such retail prices were fixed at Rexall and at Security with the intent and for the purpose of discriminating between different sec-

tions of the same community and city, in violation of §§ 2 and 4 of the act.

In the second cause of action, it is further alleged that defendant, at the Rexall store, offered for sale and sold Pond's cold cream at the retail price of nineteen cents per two-ounce bottle, which retail price was less than cost thereof to the Rexall Drug Company, as such costs are defined in § 1, chapter 221, *supra,* in violation of § 4 of the act.

In the third cause of action, it is alleged that defendant, at both Rexall and Security, offered for sale and sold two 1-¼ ounce packages of Model tobacco, at the retail price of nineteen cents per package, and gave away, in connection with the purchase, one briar pipe, which was of the reasonable value of not less than twenty-five cents, in violation of § 4 of the act.

In the fourth cause of action, it is alleged that defendant, at the Security store, offered for sale and sold Hobart's aspirin, at ten cents per bottle, which was below cost, and used such aspirin as a "loss leader," as defined in § 1, chapter 221, *supra,* in violation of § 4 of the act.

In the fifth cause of action, it is alleged that, at the Security store, defendant offered for sale and sold Eli hospital cotton, in pound packages, for twenty-nine cents per pound, while at the Security store, during the same time, defendant offered for sale and sold to certain other customers the same article at twenty-three cents per pound, in violation of § 4 of the act.

Defendant demurred to the complaint, on the ground that it failed to state facts sufficient to constitute a cause of action. The trial court overruled the demurrer, and, defendant having elected to stand on his demurrer, the court, on December 2, 1939, entered judgment granting to plaintiff the relief prayed for in the complaint, and defendant has appealed.

204

Appellant, by demurring and refusing to further plead, admits that he has violated the unfair practices act in each of the five ways alleged in the complaint. Appellant, however, does not admit that chapter 221 is constitutional, but on the contrary contends that the act is unconstitutional in several respects. Respondent does not question the right of appellant to raise the question of the constitutionality of the various sections of the act.

This act represents an attempt on the part of the legislature to regulate business as a whole, by prohibiting practices which the legislature has determined constitute unfair trade practices. Its stated purpose (§ 15) is to safeguard the public against the creation or perpetuation of monopolies, and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent, and discriminatory practices, by which fair and honest competition is destroyed or prevented. It is further declared that the act shall be liberally construed, that its beneficial purposes may be subserved.

It is apparent that the statute was passed in the attempted exercise of the state's police power. That being so, the inquiry of this court is limited to determining whether the object of the statute is one for which the police power may legitimately be invoked, and, if so, whether the act bears a reasonable and substantial relation to the object sought to be attained. The two problems involve substantially different considerations, and will be separately discussed.

We are of the opinion that the avowed purpose of the act is well within the state's police power. We believe it has become firmly established that the police power of the state extends not only to the preservation of the public health, safety and morals, but also to the preservation and promotion of the public welfare.

*Tacoma v. Boutelle,* 61 Wash. 434, 112 Pac. 661. In *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998, we find the following statement relative to police power:

"However difficult it may be to give a precise or satisfactory definition of 'police power,' there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that it must reasonably tend to correct some evil or promote some interest of the state, and not violate any direct or positive mandate of the constitution."

The legislature is vested with a wide discretion in determining what the public interest requires, and what measures are necessary to protect those interests. *State v. Somerville,* 67 Wash. 638, 122 Pac. 324; *Shea v. Olson, supra; McDermott v. State,* 197 Wash. 79, 84 P. (2d) 372.

Appellant contends that, instead of safeguarding the public against monopolies and encouraging competition, the effect of the act will be to encourage monopolies and stifle competition, in that it will tend to destroy the small merchant who cannot do business as cheaply as the large concern which can go into the open market and buy for much less than can the small merchant. It is obvious that the legislature did not think this would be the effect of the act.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is de-

clared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.*" *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940.

See, also, *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101; *Tacoma v. Fox,* 158 Wash. 325, 290 Pac. 1010.

The following cases have held acts similar to chapter 221 within the police power of the state: *People v. Kahn,* 19 Cal. App. (2d) 758, 60 P. (2d) 596; *Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co.,* 11 Cal. (2d) 634, 82 P. (2d) 3; *State v. Langley,* 53 Wyo. 332, 84 P. (2d) 767; *Great Atlantic & Pacific Tea Co. v. Ervin,* 23 Fed. Supp. 70; *Associated Merchants of Montana v. Ormesher,* 107 Mont. 530, 86 P. (2d) 1031; *Rust v. Griggs,* 172 Tenn. 565, 113 S. W. (2d) 733; and *Central Lbr. Co. v. South Dakota,* 226 U. S. 157, 33 S. Ct. 66, 57 L. Ed. 164.

The cases of *State ex rel. Richey v. Smith,* 42 Wash. 237, 84 Pac. 851; *Seattle v. Ford,* 144 Wash. 107, 257 Pac. 243; *Brown v. Seattle,* 150 Wash. 203, 272 Pac. 517; and *Balzer v. Caler,* 74 P. (2d) (Cal. App.) 839, are cited by appellant to sustain his contention. Aside from the *Balzer* case, the cited cases are not helpful herein, principally because they do not deal with legislation similar to that with which the instant case is concerned. The *Balzer* case cannot be considered as authority for the proposition for which it is cited, as on appeal to the supreme court of California, as reported in 11 Cal. (2d) 663, 82 P. (2d) 19, that court held that it was not necessary to pass upon the constitutionality of the act, and did not pass upon that question.

We now come to a consideration of the specific pro-

visions of the statute, whether the means adopted to accomplish the result are reasonably designed for that purpose, and have a real and substantial relation to the objects sought to be attained.

We may or may not agree with the economic philosophy of the unfair practices act, but it is no part of the duty of this court to determine whether the policy embodied in a statute is wise or unwise. It is primarily a legislative, and not a judicial, function to determine economic policy. If it be the declared legislative policy to curb unrestrained and harmful competition, by measures which are not arbitrary or discriminatory, it is not for us to say the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law to enforce it, the courts are both incompetent and unauthorized to deal.

It is first contended by appellant that the title to the unfair practices act is deficient, under § 19, article 2, of the state constitution. The title to chapter 221, Laws of 1939, reads:

"An Act relating to unfair competition, discrimination and practices in connection with the sale of certain articles and commodities and the rendering of certain services; defining, prohibiting and making the same unlawful; providing for civil and criminal actions in connection therewith; and prescribing penalties."

Article 2, § 19, of the constitution provides: "No bill shall embrace more than one subject, and that shall be expressed in the title." The objection is based principally on the fact that the title contains no reference to "cost," "cost of doing business," and "legal competitive price." We are satisfied that the title to the act is sufficiently comprehensive to meet the constitutional requirement, under the rule as announced in the following cases: *Davis-Kaser Co. v. Colonial Fire Underwriters Ins. Co.*, 91 Wash. 383, 157 Pac. 870; *In re Peter-*

*son's Estate,* 182 Wash. 29, 45 P. (2d) 45; *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998; *State v. Hanlen,* 193 Wash. 494, 76 P. (2d) 316; *State ex rel. Washington Toll Bridge Authority v. Yelle,* 195 Wash. 636, 82 P. (2d) 120.

"The title of the act need not be an index to the body thereof, nor need it express in detail every phase of the subject which is dealt with by the act. The essential requirement is notice; and the title is sufficient if it gives reasonable notice of the subject legislated upon." *Davis-Kaser Co. v. Colonial Fire Underwriters Ins. Co., supra.*

Appellant next contends that the act is discriminatory, denies equal protection of the law, contains special legislation, and is therefore violative of article 1, §§ 3 and 12, and article 2, § 28, subd. 6, of the state constitution, and the fourteenth amendment to the Federal constitution.

Section 2 of the act provides in part:

"Motion picture films when licensed for exhibition to motion picture houses shall not be deemed to be an article or product under this act."

Section 1 of the act defines the terms "article" and "produce" as follows: "'Article or produce' includes any article, product, commodity, thing of value, service or output of a service trade."

Article 1, § 12, of the state constitution, provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

Article 2, § 28, prohibits the legislature from enacting any private or special laws in the following cases: ". . . 6. For granting corporate powers or privileges."

It is contended that the exemption of motion picture

films from the operation of the act renders the above quoted portion of the statute tantamount to special legislation, and accords privileges and immunities to some persons which are not available to others.

"The guaranty of 'equal protection of the laws' . . . does not prohibit legislation which is limited either in the objects to which it is directed or by the territory within which it is to operate. It merely requires that all persons subject to such legislation shall be treated alike, under like circumstances and conditions, both in privileges conferred and liabilities imposed. It is not infringed by legislation which applies only to those persons falling within a specified class, if it applies alike to all persons within such class, and reasonable grounds exist for making a distinction between those who fall within such class and those who do not." 2 Cooley's Constitutional Limitations (8th ed.) 824.

The same rule, in effect, has been announced many times by this court. We refer only to the following cases: *State v. Jones,* 137 Wash. 556, 243 Pac. 1; *State ex rel. Scott v. Superior Court,* 173 Wash. 547, 24 P. (2d) 87; *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P. (2d) 1101. In the case last cited, after stating the rules in effect as above announced, we further stated:

"Within the limits of these restrictive rules, the legislature has a wide measure of discretion, and its determination, when expressed in statutory enactment, cannot be successfully attacked unless it is manifestly arbitrary, unreasonable, inequitable, and unjust."

We think no good would result from a discussion of the cases cited by appellant to sustain this contention, or a further discussion of other cases from this and other jurisdictions.

The legislature has seen fit to exclude from the operation of this act motion picture films, and has, of course, by so doing, created a classification to which

the act does not apply. We do not think it can be said that the creation of this class is either arbitrary, unreasonable, or inequitable.

■ Appellant next contends that the terms "cost" and "cost of doing business," as defined in § 1 of the act, are so uncertain that it is impossible to ascertain what is lawful and what is unlawful under the act.

Section 1 of the act defines "cost" as follows:

" 'Cost' has its usual meaning and in addition as applied to production includes the cost of raw materials, labor and all overhead expenses of the producer, and as applied to distribution means the invoice cost or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor and vendor."

By the same section, "cost of doing business" is defined as follows:

" 'Cost of doing business' or 'overhead expense' means all costs of doing business incurred in the conduct of such business and must include without limitation the following items of expense: Labor (including salaries of executives and officers), rent, depreciation, selling cost, maintenance of equipment, delivery costs, credit losses, all types of licenses, taxes, insurance and advertising."

The above definitions are substantially the same as those contained in Statutes of California, 1935, chapter 477, § 3, p. 1548, except that the Washington statute contains additional language to the effect that the term " 'cost' has its usual meaning," and "cost of doing business," under the California statute, includes "interest on borrowed capital." The definitions of the terms "cost" and "cost of doing business," appearing in the Wyoming statute (Session Laws of Wyoming, 1937, ch. 73, § 2, p. 113), are identical with the California statute, except that included in "cost of doing business," under the California statute, are the words "in-

terest on borrowed capital," while the Wyoming statute uses the words "legal rate of interest on capital." The terms "cost" and "cost of doing business," under the Montana statute (Laws of Montana, 1937, ch. 80, § 3, p. 147), are identical with those under the California act.

The first case in California to pass upon the act above referred to is *People v. Kahn,* 19 Cal. App. (2d) 758, 60 P. (2d) 596, wherein the appellant had been found guilty of selling a can of Crisco below cost. The court stated:

"We have no hesitancy in holding that, generically, legislation prohibiting unfair competition and preventing acts which stifle competition, is well within the surveyed limits of the police power. . . .

"Nor do we entertain any serious doubt that, in its endeavor to protect the public from the evil effects of unfair trade practices, the legislature's determination that sales below cost as here prohibited constitute an economic evil which should be curbed, is a conclusion which we may not question if we would."

In the cited case, answering the same question raised by appellant in the instant case, the court further stated:

"It must be conceded that in many cases it is going to be extremely difficult to determine what the cost of an article is. We are of the opinion, however, that the difficulty will be a factual one, that of discovering the cost, as a truth, and not a legal one, that of discovering what the legislature meant by the term. A statute is, of course, not to be declared invalid because of any difficulty that may arise in applying its provisions."

The act was held to be constitutional, and the judgment was affirmed.

The same act was before the California district court of appeals in *Balzer v. Caler,* 74 P. (2d) (Cal. App.) 839. The court held that intent to injure competitors

and destroy competition was a necessary element of the illegal selling of goods below cost, and from the evidence found that the defendant did not sell the goods below cost, with that purpose in view. However, because of the insistence of counsel that § 3 of the act defining "cost" and "cost of doing business" was unconstitutional, the court proceeded to consider those questions, and held the act unconstitutional. However, the constitutional questions involved were certified to the supreme court of California, in *Balzer v. Caler,* 11 Cal. (2d) 663, 82 P. (2d) 19, and that court refused to consider the constitutional questions, because the trial court had found, upon competent evidence, that, although the defendant sold certain articles below cost, those acts were not performed for the purpose of injuring competitors and destroying competition, the supreme court stating that, because of such finding, it was unnecessary to pass upon the constitutionality of the act.

The arguments in the *Balzer* case, in the California district court of appeals, were fully considered in the Wyoming case of *State v. Langley,* 53 Wyo. 332, 84 P. (2d) 767. It should be kept in mind that the definitions of "cost" and "cost of doing business" in the California and Wyoming acts are identical, and substantially the same as provided in the Washington act. The court, in the *Langley* case, after discussing the *Balzer* case, stated:

"Hence, in the absence of provisions to the contrary, we must presume that the legislature did not intend to prescribe that the cost must be absolutely exact, and that it must be based upon the precise method of accounting which any one merchant might adopt, but meant, by 'cost,' what business men generally mean, namely, the approximate cost arrived at by a reasonable rule. Hence, if a particular method adopted by a merchant cannot, under the facts disclosed, be said to

be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct. In other words, all that a man is required to do under the statute is to act in good faith."

In *Associated Merchants of Montana v. Ormesher,* 107 Mont. 530, 86 P. (2d) 1031, the court held the definition of the terms "cost" and "cost of doing business" was not too indefinite and uncertain, the court relying to a great extent on the case of *State v. Langley, supra.*

In *Great Atlantic & Pacific Tea Co. v. Ervin,* 23 Fed. Supp. 70, the Federal district court of Minnesota held invalid a part of the Minnesota act, in which "cost of doing business" was defined as "the average of all costs of doing business incurred in the conduct of such business during the calendar year immediately preceding any alleged violation of this act," on the ground, among others, that it was arbitrary and unreasonable to require such costs to be determined for a prescribed period, not giving effect to current selling costs. The case strongly intimates that a definition which took into account a merchant's current selling costs would not be unreasonable. This case, however, held that the subject matter of the legislation is within the police power of the state, and in answer to a contention that the business sought to be regulated was not one affected with a public interest, the court stated:

"The words 'affected with a public interest' mean nothing more than 'subject to the exercise of the police power.' *Nebbia v. New York,* 291 U. S. 502."

In the case of *Rust v. Griggs,* 172 Tenn. 565, 113 S. W. (2d) 733, the definition of "cost," under the Tennessee act, was held not to be too indefinite, but the case is not of much assistance, because of the difference in the definition of the term "cost."

Many of the specific objections raised by appellant to the definition of the terms "cost" and "cost of doing

business" are, we think, sufficiently answered in the case of *State v. Langley, supra.*

If we had before us a proper factual background, we might more easily determine whether or not the terms "cost" and "cost of doing business," as defined in chapter 221, are too uncertain and indefinite to reasonably be applied by any merchant; but we have in this case only the language of the statute, and we are not prepared to say at this time, judged by the language of the statute alone, that simple and proper accounting practices will not disclose the necessary information. We have been cited to no case, in which the terms "cost" and "cost of doing business" were similar to ours, where any court of last resort has held the definition of the terms so uncertain and indefinite as to be impossible of application. On the other hand, we have the cases hereinbefore referred to, and we desire to especially call attention to the cases of *People v. Kahn, Associated Merchants of Montana v. Ormesher,* and *State v. Langley, supra,* wherein the language of statutes almost identical with our own was held sufficiently definite to meet all constitutional requirements.

It is next contended that that portion of § 6, chapter 221, relating to "cost survey," is so vague and uncertain that it cannot be sustained. The section provides in part as follows:

"And in any civil or criminal proceeding under this act, where a particular trade or industry, of which the person, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this act."

It may be admitted that the term "cost survey" is not as definite as it might be. Again we are met with

the difficulty of determining, from the wording of the section and in the absence of any evidence, whether or not the term "cost survey" has a meaning generally understood among those coming under the act. It is also apparent that all the statute does, or was intended to do, is to create a rule of evidence, which of course the legislature may do. See 16 C. J. S. 321; 20 Am. Jur. 38 *et seq.*; 2 Cooley's Constitutional Limitations (8th ed.) 766. See, also, *Jolliffe v. Brown*, 14 Wash. 155, 44 Pac. 149, and *In re Milecke*, 52 Wash. 312, 100 Pac. 743. In the instant case, the statute does not say that the "cost survey" shall be *prima facie* evidence, nor does it attempt to state what probative value the "cost survey" shall have, but only that when a cost survey has been established, it shall be deemed competent evidence to be used in proving cost.

The California and Wyoming statutes contain provisions identical with § 6 of our act, but no mention is made of this question in the decisions in either of the states last above referred to.

Two cases have been called to our attention, in which courts have passed upon the term "cost survey." In *Associated Merchants of Montana v. Ormesher*, 107 Mont. 530, 86 P. (2d) 1031, the supreme court of Montana upheld a provision identical with § 6, of chapter 221, stating:

"This statute, it should be noted, simply establishes the admissibility of such evidence. It does not purport to prescribe the weight or credibility to be given to the evidence, as did the statute which was condemned on this ground in *Great Atlantic & Pac. Tea Co. v. Ervin, supra.* Also, there were in the Minnesota statute other features, not in ours, upon which the court rested its conclusion as to the invalidity of the cost survey provisions. Rules of evidence are subject to legislative control so long as defendant is given a fair and impartial trial and so long as no constitutional

limitation is violated. (*State v. Pippi,* 59 Mont. 116, 195 P. 556.) If a defendant's business is, because of peculiar circumstances, not fairly to be governed by the cost survey, he is privileged to so show. The statute cannot be condemned on this ground."

The other case cited herein and referred to in the Montana case is *Great Atlantic & Pacific Tea Co. v. Ervin,* 23 Fed. Supp. 70, wherein the court held the provisions relative to "cost survey" were too vague, arbitrary and indefinite to be sustained. However, there are differences in the Minnesota statute and the Washington statute, which render the decision last above referred to of little help in the instant case. The Minnesota act (Laws of Minnesota, 1937, ch. 116, part two, § 5, p. 184) provides, among other things, that the cost survey "shall be deemed *prima facie* evidence of cost of all individuals," etc., and it further provides that sales at prices less than the actual replacement cost of the goods, plus the average cost, as shown by the cost survey, shall be deemed to be sales below cost. We are of the opinion that the objectionable features found in the Minnesota act are not present in § 6, of chapter 221.

 It is next contended that the term "legal competitive price," as used in § 2, chapter 221, is so vague and uncertain that it cannot be sustained. Section 2 provides in part:

"Provided, however, That nothing in this section shall be construed to prohibit the meeting in good faith of a legal competitive price."

It is contended by appellant that, while § 2 of chapter 221 contemplates that a merchant may sell below cost, if he so desires, to meet legal competitive prices, to do so under the act would place upon such merchant the insuperable burden of determining whether the prices of competitors are legal. However, again we

have been cited to no case which sustains appellant's contention, where the act requires, as does the act in the instant case, that any such sale must be made with intent to destroy competition, and that legal competitive prices may be met, provided they are met in good faith. The University of Pennsylvania Law Review, in its issue of December, 1939, in discussing the case of *Lief v. Packard-Bamberger & Co.*, 123 N. J. L. 180, 8 A. (2d) 291, wherein the New Jersey act was held unconstitutional, points out the difference between those acts where intent to destroy or injure must be present and those which make the mere selling below cost unlawful, regardless of intent, and further states that of some twenty-six states having fair sales acts, the majority require an intent to injure competitors, and that the acts having this requirement have withstood the attack of unconstitutionality. Our investigation leads us to the conclusion that the difference between the acts which have been held constitutional and those declared to be unconstitutional, as pointed out in the above mentioned article, is the basic distinction upon which the decisions rest.

We are therefore of the opinion that if a merchant in good faith reduces his prices to meet those of a competitor, who he in good faith believes has a legal price, he will not be violating either the intent or the wording of the act.

As to the effect of a requirement of illegal intent on statutes claimed to be indefinite, see *People v. Kahn, supra; State v. Langley, supra; Omaechevarria v. Idaho,* 246 U. S. 343, 38 S. Ct. 323, 62 L. Ed. 763; and *Hygrade Provision Co. v. Sherman,* 266 U. S. 497, 45 S. Ct. 141, 69 L. Ed. 402. While the last two cases cited do not deal with unfair practices acts, they do construe statutes claimed to violate the fourteenth amendment of the Federal constitution, and we think the following

language used in the *Omaechevarria* case, *supra,* applicable to those affected by chapter 221:

"Men familiar with range conditions and desirous of observing the law will have little difficulty in determining what is prohibited by it. Similar expressions are common in the criminal statutes of other states. This statute presents no greater uncertainty or difficulty, in application to necessarily varying facts, than has been repeatedly sanctioned by this court. *Nash v. United States,* 229 U. S. 373, 377; *Miller v. Strahl,* 239 U. S. 426, 434. Furthermore, any danger to sheepmen which might otherwise arise from indefiniteness, is removed by § 6314 of Revised Codes, which provides that: 'In every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence.' "

It is further contended that chapter 221 is a price-fixing statute. It seems to have been the rule, as announced in *Tyson & Brother v. Banton,* 273 U. S. 418, 47 S. Ct. 426, 71 L. Ed. 718, and many other cases, that a state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is affected with a public interest. The term "affected with a public interest" has, to say the least, been given a much broader meaning than had theretofore been given it, in one of the last cases passing upon this question, namely, *Nebbia v. New York,* 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, wherein the court stated:

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. *Wolff Packing Co. v. Industrial Court,* 262 U. S. 522, 535. The phrase 'affected with a public interest' can,

in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good. . . . But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells."

We cite the *Nebbia* case, *supra,* not as authority to sustain the statute in the instant case, as we do not believe chapter 221 is a price-fixing statute, but only to indicate the length to which courts have gone in holding the legislatures may regulate business, even to the point of fixing prices in an appropriate case. In *Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co.,* 11 Cal. (2d) 634, 82 P. (2d) 3, the court, in dealing with the question, said:

"In its true sense it is not a price fixing statute at all. It merely fixes a level below which the producer or distributor may not sell with intent to injure a competitor. . . .

"The statute must be held to be a reasonable attempt upon the part of the state to accomplish a valid object. It must be borne in mind that this statute does not regulate the selling of commodities—it is the predatory trade practice of selling below cost with intent to injure competitors which the legislature on reasonable grounds has determined is vicious and unfair that is prohibited. Such determination is clearly within the legislative power. The state may not have power to regulate all trade practices affecting competition, but it clearly has power to restrict or prohibit trade practices which upon reasonable grounds it determines are predatory, vicious, unfair and anti-social."

This matter is specifically passed upon in *State v. Langley, supra,* and *Associated Merchants of Montana v. Ormersher, supra,* and in both cases it was held the statute was not a price-fixing statute. Also, in the case of *Rust v. Griggs, supra,* this contention was made, but

dismissed by the court by simply stating that the statute was not a price-fixing statute.

Appellant relies upon *State v. Packard-Bamberger,* 16 N. J. M. 479, 2 A. (2d) 599, and *Balzer v. Caler,* 74 P. (2d) (Cal. App.) 839, to sustain his contention that chapter 221 is a price-fixing statute. In the first case cited, the district court of New Jersey did hold that the New Jersey act was in effect a price-fixing statute. However, a writ of certiorari was allowed by the supreme court of New Jersey (123 N. J. L. 180, 8 A. (2d) 291), and while the act was held unconstitutional, no discussion of price fixing was had. The decision is very largely based upon the fact that the New Jersey act did not require sales below cost to be made with the intent to injure competitors, for after distinguishing the cases of *Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., supra,* and *State v. Langley, supra,* the court stated:

"In the case presently pending, there is no definition of wrongful intent or purpose to limit fair competition or to inflict injury upon anyone. Indeed, intent or motive or the existence of injury to anyone are not essential to punishment under this act."

The case of *Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co., supra,* held that the California act was not a price-fixing law, and thereby reversed any contrary holding by the district court in *Balzer v. Caler, supra.*

We are therefore of the opinion chapter 221 is not a price-fixing statute, and we agree with the following statement in *State v. Langley, supra:*

"The legislature, by the statute here in question, sought, not to fix prices, but to prevent ruinous price cutting, by which competitors might be injured and competition be destroyed. To do that, it was, of course, necessary to fix some limit. It might, perhaps, have set other limits than that which was fixed. The limit

of 'not below cost' was only one of a number of others which might, perhaps, have been selected. The one actually selected was thought to be the most just under the circumstances. It was but a means to an end, not an end in itself."

It is next contended that § 2 of the act, providing that one may not sell merchandise for different prices at different stores in the same locality, or city, constitutes an unwarranted interference with private business, and operates to the prejudice of the public interest. That part of § 2 which pertains to the question raised reads as follows:

"It shall be unlawful for any person, engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with the intent to destroy the competition of any regular established dealer in such article or product, or to prevent the competition of any person, who in good faith, intends and attempts to become such dealer, to discriminate between different sections of the same community, city, town or village in this state, by selling or furnishing such article or product at a lower price in one section than in another: Provided, That nothing herein contained shall prevent differentials which make allowances for differences, if any, in the grade, quality or quantity when based and justified in the cost of manufacture, sale or delivery, or the actual cost of transportation from the point of production if a raw product or commodity, or from the point of manufacture if a manufactured product or commodity, or from the point of shipment to the point of destination."

This section also prohibits locality discrimination, which embraces any scheme of special rebates, collateral contracts, or any device of any nature whereby such discrimination is, in substance or fact, effected in violation of the spirit and intent of the act.

The questions raised by appellant on this phase of the case are answered adversely to appellant's conten-

tions in *State v. Central Lumber Co.*, 24 S. D. 136, 123 N. W. 504, wherein a provision of the statute of South Dakota, almost identical with § 2, chapter 221, was held not to offend against the fourteenth amendment, or due process clause, of the constitution. The cited case was before the supreme court of the United States, and there affirmed. *Central Lumber Co. v. South Dakota*, 226 U. S. 157, 57 L. Ed. 164, 33 S. Ct. 66.

The same objection raised herein by appellant was raised against the California act, and disposed of contrary to appellant's contention, in the *Wholesale Tobacco Dealers* case, *supra.*

Appellant cites and relies upon the case of *Great Atlantic & Pacific Tea Co. v. Ervin*, 23 Fed. Supp. 70, hereinbefore referred to. We are of the opinion that the cited case is not controlling here, for the reason that the acts in the cited case are prohibited, regardless of the intent or purpose with which they are done, and the holding of the court, as we read it, is based upon this fact.

It is further contended that § 1 of the act is violative of the due process clause of the state and Federal constitutions, for the reason that it results in the regulation of wages in private industry. Section 1, chapter 221, defines the terms "article or produce" and "vendor" as follows:

" 'Article or produce' includes any article, product, commodity, thing of value, service or output of a service trade."

" 'Vendor,' in addition to its usual meaning, includes any person who performs work upon, renovates, alters or improves any personal property belonging to another person."

It is contended that the inevitable result of the above language is not only to fix the prices of commodities, but also that wages are controlled and regulated

thereby. We are unable to agree with this contention of appellant. All that the statute contemplates is that labor, at the prevailing wage scale in the trade in which such person is engaged, shall be considered in determining the cost of doing business, and even though it should appear that the wages paid by one prosecuted under the act are lower than the prevailing wage scale, such person would not, in our opinion, be guilty of a violation of the act, unless it should appear that such wages were wilfully paid with intent to injure competitors and destroy competition.

All of the questions presented here, relative to the means adopted to accomplish the purpose of the act, are of first impression in this state. It might well be, had some of the questions been presented to us based on a factual situation, that much of the authority cited by appellant would have been more applicable herein. Considering this statute, then, only from the standpoint of the language of the act, in the light of the interpretation placed on practically the same wording in similar acts by the courts of other jurisdictions, we are unable to escape the conclusion that chapter 221 does not violate any of the provisions of the state and Federal constitutions to which our attention has been called.

The judgment is affirmed.

BLAKE, C. J., BEALS, MAIN, and DRIVER, JJ., concur.

SIMPSON, J. (dissenting)—The act under consideration is unconstitutional for three reasons. First, the regulation which it undertakes exceeds the police power of the state. Second, the act is so uncertain and indefinite that the meaning of its provisions cannot be ascertained. Third, it places an unreasonable, arbitrary, and unjust burden upon those made subject to its provisions.

It must be borne in mind that the act in question

attempts to regulate the sale of all property in this state except as mentioned in section seven. It regulates the business of every person, firm, association, organization, partnership, business trust, company, corporation or municipal or other public corporation engaged in the production, manufacture, distribution or sale of all articles and products of general use or consumption.

In the following cases this court has had occasion to examine the limitations imposed upon legislative regulation supported by the police power of the state:

"The power of the legislature to make all needful rules and regulations for the health, comfort, and well-being of society cannot be questioned, but there are certain limits beyond which the legislature cannot go, without trenching upon liberty and property rights which are safeguarded by the state and Federal constitutions. As said by the court in *In re Jacobs*, 98 N. Y. 98, 50 Am. Rep. 636,

" 'The limit of the power cannot be accurately defined, and the courts have not been able or willing definitely to circumscribe it. But the power, however broad and extensive, is not above the Constitution. . . . Generally it is for the legislature to determine what laws and regulations are needed to protect the public health and secure the public comfort and safety, and while its measures are calculated, intended, convenient and appropriate to accomplish these ends, the exercise of its discretion is not subject to review by the courts. But they must have some relation to these ends. Under the mere guise of police regulations, personal rights and private property cannot be arbitrarily invaded.' " *State ex rel. Richey v. Smith*, 42 Wash. 237, 84 Pac. 851.

"The courts will go far in sustaining the exercise of the police power for the preservation of public health and safety, and in so doing private rights in conflict therewith are overridden; but on the other hand, the courts are equally concerned to see that, under the guise of protecting the public, private business—es-

pecially that carried on upon private property—is not arbitrarily restricted or interfered with. . . .

"True we have said, in effect, that if a state of facts can be assumed which will justify the legislation, the court must assume that such a state of facts exists; but we have never said that, in a case involving the carrying on of a business, not harmful in itself, upon private property; and that should not be the rule in such a case. Where such private rights exist, the court should review the legislative action and determine whether the legislative body has imposed unnecessary restrictions upon a lawful occupation or a lawful right. McQuillin on Municipal Corporations, vol. III, § 893; *In re Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636; *Ex parte Hayden,* 147 Cal. 649, 82 Pac. 315, 109 Am. St. 183, 1 L. R. A. (N. S.) 184; *State v. Wiggam,* 187 Ind. 159, 118 N. E. 684; *In re Steube,* 91 Ohio St. 135, 110 N. E. 250; *City of Zion v. Behrens,* 262 Ill. 510, 104 N. E. 836, Ann. Cas. 1915A 1057, 51 L. R. A. (N. S.) 562.

"And so, coming to the provisions of the ordinance in question, we find that it forbids hawking, not only in the streets, alleys and public places, but on all private property as well. Unquestionably the ordinance is good as to the streets and public places, as we will assume that conditions justify the action of the legislative body in that respect. It might be that if hawking on private property closely adjacent to the public streets was forbidden, we might see in such a provision a reasonable exercise of the police power as tending to prevent the collection of crowds upon the streets and sidewalks about the open door of the place where the hawking was going on, or some similar obstruction to traffic or interference with the public safety. But that is not the question now before us. *Every one has a natural right to sell his own merchandise on his own private property, in his own way, to all who come there to buy; and if his manner of selling offends, those so offended may stay away. Self-interest would seem to be the only regulation needed in such cases.*" (Italics mine.) *Seattle v. Ford,* 144 Wash. 107, 257 Pac. 243.

"The same court in the case of *City of Aurora v. Burns,* 319 Ill. 84, 149 N. E. 784, uses this language:

" 'The police power, however, has constitutional limits, and any measure enacted or adopted in its exercise, to be sustained, must bear some reasonable relation to the purposes for which the power may be exercised. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private rights. The legislative determination as to what is a proper exercise of the police power is not conclusive, but is subject to review by the courts. [Authorities.] If the means employed have no real, substantial relation to public objects within the state's power, or if those means are arbitrary and unreasonable, the judiciary will disregard mere forms and interfere for the protection of rights injuriously affected by such illegal action.' " *Brown v. Seattle,* 150 Wash. 203, 272 Pac. 517.

If constitutional, legislation such as now before us presages extension of the police power which bids fair to take from our citizens all of the personal liberties and rights of private property hitherto considered to be guaranteed by our state and Federal constitutions.

"Liberty, in its broad sense as understood in this country, means the right, not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." *In the Matter of Application of Peter Jacobs,* 98 N. Y. 98, 50 Am. Rep. 636.

1 Blackstone, Commentaries, 138, says that property "consists in the free use, enjoyment, and disposal of all his acquisitions."

In the following cases it is held that the right to use and possess is property: *Missouri Pacific R. Co. v. Nebraska,* 164 U. S. 403, 41 L. Ed. 489, 17 S. Ct. 130; *Dobbins v. Los Angeles,* 195 U. S. 223, 49 L. Ed. 169, 25 S. Ct. 18; *Pennsylvania Coal Co. v. Mahon,* 260 U. S.

393, 67 L. Ed. 322, 43 S. Ct. 158; *Washington ex rel. Seattle Trust Co. v. Roberge,* 278 U. S. 116, 73 L. Ed. 210, 49 S. Ct. 50; *Commonwealth v. Clearview Coal Co.,* 256 Pa. 328, 100 Atl. 820, L. R. A. 1917E, 672.

The right to sell and dispose of property is a property right. *Buchanan v. Warley,* 245 U. S. 60, 62 L. Ed. 149, 38 S. Ct. 16; *Duplex Printing Press Co. v. Deering,* 254 U. S. 443, 65 L. Ed. 349, 41 S. Ct. 172; *Frost v. Corporation Commission,* 278 U. S. 515, 73 L. Ed. 483, 49 S. Ct. 235.

"The right of the owner to fix a price at which his property shall be sold or used is an inherent attribute of the property itself." *Tyson & Bros. v. Banton,* 273 U. S. 418, 71 L. Ed. 718, 47 S. Ct. 426.

The majority maintains that the act is not a price-fixing statute, relying upon the authority of *Wholesale Tobacco Dealers Bureau v. National Candy & Tobacco Co.,* 11 Cal. (2d) 634, 82 P. (2d) 3; *State v. Langley,* 53 Wyo. 332, 84 P. (2d) 767; and *Rust v. Griggs,* 172 Tenn. 565, 113 S. W. (2d) 733. I do not find the reasoning of these cases to be persuasive in this respect. In *Rust v. Griggs, supra,* the court does not attempt legal analysis of this issue, but satisfies itself with the flat holding that the Tennessee act is not an attempt to regulate prices. The California court, in the *Wholesale Tobacco Dealers Bureau* case, *supra,* adds little of substantive reasoning. It in effect meets the question merely by holding that, in any event, the act is a valid exercise of the police power. In *State v. Langley, supra,* the court simply maintains that the legislative purpose was not to fix prices, but only to prevent certain practices considered detrimental to business, that the regulation selected was merely a means to an end.

It is no answer to the contention that certain regulation is price fixing in nature to say that control over price is not an end in itself, but is only incidental to an

ultimate purpose of a somewhat different nature. Under constitutional limitations it is obvious that legislation of this character, based upon the police power, must always justify itself, not in its effect upon price, but in the protection which it affords to the interests of society. Conceding that price regulation is not invalid *per se,* it appears obvious to me that any legislation placing a direct limitation upon the price at which any article may be disposed of by its owner is properly denominated as price fixing in character.

It is true, of course, that the act before us does not attempt complete regulation of price. The act, generally speaking, will be effective only under competitive trade conditions; there are certain named exceptions to its application; it does not purport to establish more than a minimum price at which goods can be sold; and the price floor which it defines is individually controlled, to some extent, by each of those subject to its provisions. Nevertheless, the act provides a plain example of a direct and substantial invasion of the individual right to unrestricted determination of the price at which private property may be sold.

The constitutionality of state legislation undertaking the regulation of private enterprise has long been a source of the most difficult questions presented to the courts of this country. Perhaps the most vexatious of the problems in this general category have had to do with price control.

A long line of decisions of the supreme court of the United States, beginning with *Munn v. Illinois,* 94 U. S. 113, 24 L. Ed. 77, has adhered to the test that only businesses "affected with a public interest" were subject to regulation under the police power of the states. Many of these holdings, including the landmark case just cited, have involved attempted regulation of prices. Notable among those in which price-

fixing legislation was held to be inconsistent with due process are *Wolff Packing Co. v. Court of Industrial Relations*, 262 U. S. 522, 67 L. Ed. 1103, 43 S. Ct. 630; *Tyson & Bro. v. Banton*, 273 U. S. 418, 71 L. Ed. 718, 47 S. Ct. 426, 58 A. L. R. 1236; *Ribnik v. McBride*, 277 U. S. 350, 72 L. Ed. 913, 48 S. Ct. 545; *Williams v. Standard Oil Co.*, 278 U. S. 235, 73 L. Ed. 287, 49 S. Ct. 115, 60 A. L. R. 596; *New State Ice Co. v. Liebmann*, 285 U. S. 262, 76 L. Ed. 747, 52 S. Ct. 371.

It may be conceded that the area including those businesses "affected with a public interest" has been broadened to a remarkable degree since Sir Matthew Hale, in the seventeenth century, wrote that phrase into a treatise on "The Ports of the Sea," and since it was adopted by the supreme court of the United States as the basis for validating state regulation of charges made by grain elevator companies in Illinois. *Munn v. Illinois, supra.* Many attempts have been made to determine with a greater degree of accuracy what is meant by the phrase "affected with a public interest." It has been argued that in a recent case involving price control of the milk industry in the state of New York, *Nebbia v. New York*, 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, the supreme court abrogated the public interest doctrine. Close examination of the majority opinion in the *Nebbia* case, however, convinces me that the suggested conclusion does not necessarily follow. Surely it must be admitted that there are fundamental differences in the legislation there considered and in its factual context which distinguish it from the case at bar. The regulation in the *Nebbia* case was an emergency measure, limited in its application to a term of short duration, and confined to activity in a single business asserted by the legislature and conceded by the court to be of paramount importance to the people of the state. This court has al-

ready indicated that it considers the regulation in that case to be the most extreme exercise of the police power consistent with due process. *Uhden, Inc. v. Greenough*, 181 Wash. 412, 43 P. (2d) 983.

In any event, it can safely be said that the supreme court of the United States has not, in the *Nebbia* case, or in subsequent decisions, overruled the line of price-control cases cited on a previous page. In a case even more recent than *Nebbia v. New York, supra*, viz., *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 U. S. 183, 81 L. Ed. 109, 57 S. Ct. 139, the court, in distinguishing this group of cases concedes the established rule to be that price-fixing legislation is void except in unusual circumstances.

In one among this group of decisions, *Wolff Packing Co. v. Court of Industrial Relations, supra*, Chief Justice Taft stated:

"It has never been supposed, since the adoption of the Constitution, that the business of the butcher, or the baker, the tailor, the wood chopper, the mining operator or the miner was clothed with such a public interest that the price of his product or his wages could be fixed by State regulation. It is true that in the days of the early common law an omnipotent Parliament did regulate prices and wages as it chose, and occasionally a Colonial legislature sought to exercise the same power; but nowadays one does not devote one's property or business to the public use or clothe it with a public interest merely because one makes commodities for, and sells to, the public in the common callings of which those above mentioned are instances.

"An ordinary producer, manufacturer or shopkeeper may sell or not sell as he likes, *United States v. Trans-Missouri Freight Association*, 166 U. S. 290, 320; *Terminal Taxicab Co. v. District of Columbia*, 241 U. S. 252, 256, and while this feature does not necessarily exclude businesses from the class clothed with a public interest, *German Alliance Insurance Co. v. Lewis*, 233

U. S. 389, it usually distinguishes private from quasi-public occupations. . . .

"To say that a business is clothed with a public interest, is not to determine what regulation may be permissible in view of the private rights of the owner. The extent to which an inn or a cab system may be regulated may differ widely from that allowable as to a railroad or other common carrier. It is not a matter of legislative discretion solely. It depends on the nature of the business, on the feature which touches the public, and on the abuses reasonably to be feared. To say that a business is clothed with a public interest is not to import that the public may take over its entire management and run it at the expense of the owner. The extent to which regulation may reasonably go varies with different kinds of business. The regulation of rates to avoid monopoly is one thing. The regulation of wages is another. A business may be of such character that only the first is permissible, while another may involve such a possible danger of monopoly on the one hand, and such disaster from stoppage on the other, that both come within the public concern and power of regulation.

"If, as, in effect, contended by counsel for the State, the common callings are clothed with a public interest by a mere legislative declaration, which necessarily authorizes full and comprehensive regulation within legislative discretion, there must be a revolution in the relation of government to general business. This will be running the public interest argument into the ground, to use a phrase of Mr. Justice Bradley when characterizing a similarly extreme contention. Civil Rights Cases, 109 U. S. 3, 24. It will be impossible to reconcile such result with the freedom of contract and of labor secured by the Fourteenth Amendment."

It is also frequently said that legislative exercise of the police power is limited to regulation designed for the protection of the health, safety, morals and welfare of the public, the "public welfare" being a comparatively recent and obviously uncertain addition to this classification. The legislature is not omnipotent

in its determination that certain regulation is necessary in the preservation of the stated interests of the public, nor is there any magic in the phrase "affected with a public interest." A business is not affected with a public interest simply because the lawmaking body so determines. *Big Bend Auto Freight v. Ogers,* 148 Wash. 521, 269 Pac. 802.

I fail to see how the public safety, health, morals, or welfare are concerned with, or that there can be said to be a public interest in, the sale of commodities ranging all the way from pins and needles to freight cars, or as Justice Field put it, "from calico gowns to city mansions." Nor does it appear that every such business in this state is attended with unusual or exceptional circumstances.

It is plainly apparent that the act in question constitutes a vital impairment of the firmly established right of the individual to dispose of his property at any price upon which he and his purchaser may agree (*State v. Packard-Bamberger & Co.,* 16 N. J. M. 479, 2 A. (2d) 599; *Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co.,* 12 Atl. (2d) (Md.) 201), and an unwarranted violation of the rights in private property guaranteed by fourteenth amendment due process.

If government may restrain the sale of all commodities at less than cost, then it may enforce a rule that property must be sold at a certain per cent of profit and it may raise the sale price until the merchant cannot make a sale. Such regulation destroys property rights to the same extent as it would by outright appropriation.

This act destroys the ideal of free enterprise which has been the dominant spirit of American progress. It is contrary to the wording and ideas contained in our state and National constitutions.

Conceding, however, for the sake of argument, that

the legislature had the power to enact this law, it is my conclusion that the sections of the act prohibiting sales below cost are invalid because its terms are so vague and uncertain as to be unintelligible. As prefatory to a more general discussion of the uncertainty which I find to be implicit in these provisions, the effect on this problem of the purpose with which the sale is made will be analyzed.

The majority suggests that *Hygrade Provision Co. v. Sherman,* 266 U. S. 497, 69 L. Ed. 402, 45 S. Ct. 141, and *Omaechevarria v. Idaho,* 246 U. S. 343, 62 L. Ed. 763, 38 S. Ct. 323, are authority for application of the principle that the requirement of intent adds definiteness to the provisions of a statute. For reasons which it seems advisable to point out in some detail, I do not find the analogy of the above cases to be persuasive in the case at bar.

The court in *Hygrade Provision Co. v. Sherman, supra,* in denying appellant's objection that the word "kosher" and the phrase "Orthodox Hebrew religious requirements" were so indefinite and uncertain as to render the statute unconstitutional for want of any ascertainable standard of guilt, relied to some extent upon the fact that liability under the statute was conditioned upon proof that the accused not only falsely represented the product to be kosher, but did so with intent to defraud. As a result, said the court, appellants were "not required to act at their peril, but only to exercise their judgment in good faith, in order to avoid coming into conflict with the statutes." Liability is provided for in the case at bar (§ 4 of the act) if any goods are sold below cost "for the purpose of injuring competitors or destroying competition." While it is obvious that a sale of goods in the ordinary course of business is not accompanied, at least need not be accompanied, with an intent to defraud, it is equally

clear that any given sale by a retailer having one or more competitors for the sale of the particular article is commonly made with the purpose of advancing the vendor's own selfish interests and with the known effect of injuring his competitors to that extent.

This factor is intrinsic in our so-called competitive economy. The existence of an intent to injure competitors or destroy competition is a stable factor which, from the very nature of things, is implicit in practically every sale; its presence is as consistent with sales above cost as it is with sales at a loss.

In *Wholesale Tobacco Dealers Bureau v. National Candy Co.*, 11 Cal. (2d) 634, 82 P. (2d) 3, the supreme court said:

"It is one thing, from a legal standpoint, to prohibit sales below cost engaged in for the purpose of injuring competitors and destroying competition, and quite another to merely prohibit all such sales regardless of intent. It may well be that an absolute prohibition regardless of intent would be unreasonable. (See *Fairmont Creamery Co. v. Minnesota*, 274 U. S. 1 [47 Sup. Ct. 506, 71 L. Ed. 893, 52 A. L. R. 163].)"

It is to be noted that the reasoning which I have employed does not tend to support the conclusion that the effect of the language used by the legislature is as if no proof of intent to inflict injury upon competitors or competition were required by the act, with the result that the act would be fatally defective for the reasons pointed out in the case cited above, *Fairmont Creamery Co. v. Minnesota.* Rather, it goes merely to show that, under normal competitive conditions, it can always be shown that the specified purpose attended the making of the sale.

The analogy presented by the *Hygrade Provision Co.* case is inapposite in this respect. It cannot be said, as did the court in that case, that the question to be

decided would relate solely to whether the putative violator of the act had exercised his judgment in good faith, or whether he had asserted an honest purpose to distinguish to the best of his judgment between what was and what was not the conduct prohibited by the statute. The difference, subjectively, in the conduct proscribed by the two statutes is plain. In the case at bar the purpose will normally be the same whether or not the sale is below cost. In the *Hygrade Provision Co.* case the state of mind denounced by the statute is the intent to defraud. Not only conceivably, but usually, the presence or absence of the fraudulent intent would be determinative of liability. This is so because an intent to defraud is considered wrongful in any situation, and is not reasonably to be assumed to be present under normal circumstances.

This analysis also tends to detract from the relevancy of the reasoning in *Omaechevarria v. Idaho*, 246 U. S. 343, 62 L. Ed. 768, 38 S. Ct. 323, to which the majority refers. In any event it is to be noted the *Omaechevarria* case and the general rule that the requirement of intent adds definiteness to the provisions of a statute are not strictly in point with reference to the act now before us. As has already been pointed out, the intent which the act requires to be proved is simply that the purpose of the seller was to injure competitors or destroy competition, a purpose in itself not necessarily wrongful, a purpose entirely separate and distinct from an intent to violate the act itself, as e. g., by a wilful sale below cost.

In much quoted paragraphs from *Connally v. General Const. Co.*, 269 U. S. 385, 70 L. Ed. 322, 46 S. Ct. 126, it was said:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will

render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. *International Harvester Co. v. Kentucky,* 234 U. S. 216, 221; *Collins v. Kentucky,* 234 U. S. 634, 638.

. . .

" '. . . The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another. [*United States v. Capital Traction Co.,* 34 App. D. C. 592]' "

This language was affirmed in a recent holding by the same court, *Lanzetta v. New Jersey,* 306 U. S. 451, 83 L. Ed. 888, 59 S. Ct. 618. Further authority is to be found in *United States v. Cohen Grocery Co.,* 255 U. S. 81, 65 L. Ed. 516, 41 S. Ct. 298; *Cline v. Frink Dairy Co.,* 274 U. S. 445, 71 L. Ed. 1146, 47 S. Ct. 681; *Smith v. Cahoon,* 283 U. S. 553, 75 L. Ed. 1264, 51 S. Ct. 582; and *Champlin Rfg. Co. v. Commission,* 286 U. S. 210, 76 L. Ed. 1062, 52 S. Ct. 559.

The logic of this reasoning is not confined to criminal cases. These principles are equally applicable to civil proceedings. *Small Co. v. American Sugar Refining Co.,* 267 U. S. 233, 69 L. Ed. 589, 45 S. Ct. 295.

In the majority opinion, it is said:

"If we had before us a proper factual background, we might more easily determine whether or not the terms 'cost' and 'cost of doing business,' as defined in chapter 221, are too uncertain and indefinite to reasonably be applied by any merchant, but we have in this case only the language of the statute, and we are not prepared to say at this time, judged by the language of the statute alone, that simple and proper accounting practices will not disclose the necessary information."

I cannot agree, as does the majority, that the reasoning of those decisions involving similar statutes in other jurisdictions which have reached a similar conclusion, i. e., *People v. Kahn,* 19 Cal. App. (2d) 758, 60 P. (2d) 596; *Associated Merchants of Montana v. Ormesher,* 107 Mont. 530, 86 P. (2d) 1031; and *State v. Langley,* 53 Wyo. 332, 84 P. (2d) 767, adequately satisfies the law in this respect as laid down by the court in *Connally v. General Const. Co., supra.*

The Montana court, in the *Ormesher* case, *supra,* relies to a large extent, in disposing of this problem, upon what is acknowledged by the writer of the opinion in *State v. Langley, supra,* to be dicta. It is there said that the standard set by the legislature is virtually reduced to one of "reasonableness," and that such a standard has been judicially determined to be sufficiently definite and certain.

It is said in *People v. Kahn, supra,* that the difficulty in determining the cost of an article would be factual rather than legal, and that a statute should not be declared void merely because of difficulties which might arise in the application of its provisions.

What has, to my mind, plainly been overlooked by these courts is the full import of the fact that the act, in defining "cost" and "cost of doing business," fails to make any provision for the manner in which the many

items of expenditure which it requires to be included in computation of cost are to be apportioned among the various articles which the retailer offers for sale. Included (§ 1 of the act) are labor, rent, depreciation, selling cost, maintenance of equipment, delivery cost, credit losses, licenses, taxes, insurance, and advertising.

The almost infinite number of problems which readily suggest themselves under this phase of the act have been exhaustively briefed by appellant. The significance of the lack of a standard for apportionment may, however, be readily appreciated by reference to but a few of the uncertainties which arise therefrom. For example: Is rent to be apportioned upon a basis of floor space occupied? Is this factor affected by the length of time an article has been in the store before it is sold? When rent varies, as it does from time to time, are goods carried over from the prior rent level subject to apportionment on the basis of the new or the old rent charge? Does depreciation refer to buildings and fixtures, or to stock, or to both? Are articles of stock peculiarly subject to depreciation to bear the whole load of this item of cost, or is it to be spread over other articles not ordinarily subject to spoilage and deterioration? Are delivery costs to be allocated only among those articles actually delivered? Are advertising costs to be borne entirely by particular articles advertised? How are credit losses to be allocated? Is any distinction to be made in the apportionment of all of these items in general between articles which require comparatively great or comparatively slight effort to sell? Other similar questions suggest themselves in endless array. How then can it be said that the act is not, in this respect, intrinsically conjectural? The conclusion that the average retailer would be unable to resolve these questions with any reasonable degree of certainty, and that there would in-

evitably be wide variations in the results of individual computations, seems inescapable.

In two of the cited cases, *People v. Kahn,* and *State v. Langley,* the court refers to an article on cost accounting in Encyclopedia Brittanica (vol. 6, 14th ed.). Mention is made of the fact that cost accounting has been long established, and that modern systems of accounting have become very accurate. It does not appear from the suggested source, however, that a *uniform* system of cost accounting has yet been established, or that there has as yet been any serious attempt to set up a cost accounting system providing for apportionment of the various items of cost *to each individual article* carried in stock by the retailer. The obvious magnitude and complexity of such a task is answer in itself to the question of why it has not yet been attempted.

It does not appear to me that these problems can be resolved by saying that the act establishes a standard of reasonableness, or that the legislature recognized that there would be a wide variation in the accounting formulas used by those subject to the act, and intended to require nothing more than that each should make a reasonable computation in good faith and not sell below that figure. Instead, it seems plain that the legislature simply failed to accord any consideration to the problem of apportionment, that no standard was in fact established, and that because there is no generally accepted formula commonly used by business men for this purpose the statute should be found to be invalid. To invest the act with a standard of conduct would, under these circumstances, be to indulge in judicial legislation.

As was said in *State v. Northwest Poultry & Egg Co.,* 203 Minn. 438, 281 N. W. 753:

"But where failure of expression rather than ambiguity of expression concerning the elements of the statutory standard is the vice of the enactment, courts are not free to substitute amendment for construction and thereby supply the omissions of the legislature."

The above cited case is also in point in that failure to provide a standard of apportionment served as one of the bases for holding unconstitutional the statute there under consideration.

Section 6 of the questioned act provides, in part:

". . . and in any civil or criminal proceeding under this act, where a particular trade or industry, of which the person, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this act."

That this section does not meet the standard of the necessary requirements of a statute is ably demonstrated in *Great Atlantic & Pacific Tea Co. v. Ervin,* 23 Fed. Supp. 70, in which it is stated:

"While it seems probable that the Legislature in enacting this section had in mind some definite and understandable thing, we think that they failed to express it in plain language. What is a 'cost survey,' and by whom or by what is it made? Does the section relate to surveys made by trade groups and associations of which an accused merchant is a member, or does it relate to anything which is denominated a 'cost survey' no matter who makes it? . . . Apparently, under this section, if a cost survey of the fair and reasonable type is introduced upon the trial of a merchant for a violation of the act, the merchant is precluded from showing that the cost of his goods based on list price less published discounts, or on invoice cost, was less than the current replacement cost, whereas, if no cost survey was available, or, if avail-

able, was not introduced in evidence, he would at least be permitted to show that on the basis of list price less published discounts, or on the basis of invoice cost, he had paid less for the goods than their current replacement cost, and had actually sold his goods at a profit. This section of the statute we regard as so vague, indefinite, arbitrary, and discriminatory that it cannot be sustained."

As is stated in the quotation from *Brown v. Seattle,* 150 Wash. 203, 272 Pac. 517, which appears earlier in this opinion, one of the questions properly to be discussed in measuring an exercise of the police power by the requirements of due process is whether the means employed are unreasonable and arbitrary.

The rule has been stated by the supreme court of the United States in this manner:

"To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts." *Lawton v. Steele,* 152 U. S. 133, 38 L. Ed. 385, 14 S. Ct. 499.

It is my conviction that the legislation before us is further to be condemned upon this basis. Even if it be conceded that the means employed are effective to reach a proper end, compliance with the act will encumber the selling of goods with an unjustifiable and oppressive burden.

Assuming that an adequate standard for apportionment has been made available it can hardly be doubted

that the task of allocating each of the various items of cost to only a few articles would involve a highly complex system of accounting. And it is common knowledge that in even the small single-unit retail enterprise the number of individual articles offered for sale will often run into the thousands. To keep current such a complex accounting project would be virtually impossible. At the very least it would substantially increase the "cost of doing business" of all retail enterprises. And it is safe to say that in many instances this requirement would be instrumental in driving the retailer out of business.

For the reasons given, I dissent.

MILLARD, STEINERT, and ROBINSON, JJ., concur with SIMPSON, J.

[1]Reported in 103 P. (2d) 38.