[No. 17542. *En Banc.* May 14, 1923.]

THE STATE OF WASHINGTON, *Respondent,* v. GUSTAV LINDBERG, *Appellant.*[1]

CRIMINAL LAW (36)—VENUE—CHANGE—DISCRETION—LOCAL PREJUDICE—REVIEW. Under the express provisions of Rem. Comp. Stat., §§ 2018, 2019, whether a change of venue on account of local prejudice shall be granted in a criminal case rests in the discretion of the trial court; and this will not be disturbed except for gross abuse, which will not be found on slight showing, and in the absence of the *voir dire* examination, or that accused was compelled to exhaust his challenge or did not have a fair trial.

VENUE (18, 21)—CHANGE OF JUDGES — PREJUDICE — AFFIDAVITS—DISCRETION OF COURT. The matter of calling in an outside judge in a criminal case is wholly discretionary where there was no application for a change of judges under Rem. Comp. Stat., §§ 209-1, 209-2.

BANKS AND BANKING (4-1)—OFFICERS—OFFENSES—LOANING OR BORROWING FROM BANK. A bank director is guilty of a felony in borrowing its money without the required resolution, unaer Rem. Comp. Stat., § 3259, which makes it a felony for any bank officer to make loans to any officer or employee, unless authorized by resolution approved by a majority of the directors, and which also makes it a felony for any officer to borrow its funds "in violation of the act"; notwithstanding the law prohibits his presence when the resolution is passed, since he is bound to take notice of the record.

SAME (4-1)—CRIMINAL LAW (6)—OFFENSES—BORROWING—INTENT. Rem. Comp. Stat., § 3259, makes it a felony for any bank officer to borrow from the bank without a resolution of the directors, regardless of his intent, and renders him liable though he thought the money came from another source; since crimes denounced as *mala prohibita* are intended as police regulations in which intent is not a necessary element.

[1]Reported in 215 Pac. 41.

CRIMINAL LAW (451)—APPEAL—HARMLESS ERROR—CONDUCT OF COUNSEL. Error cannot be assigned upon the prosecutor's demand that the accused produce certain incriminatory documents alleged to be in his possession, where, on objection made, the demand was withdrawn and the jury instructed to disregard it.

BANKS AND BANKING (4-1)—OFFICERS—OFFENSES—INSTRUCTIONS. In a prosecution of a director of a bank for borrowing from the bank in violation of Rem. Comp. Stat., § 3259, requiring authority therefor by resolution, an informative instruction stating some of the duties of bank officers is not open to the objection that it misled the jury to find the defendant guilty of other offenses, upon the evidence of loose and unbusinesslike methods amounting to almost total failure to comply with the law, where the issues were very carefully stated, the particular statute pointed out, and precautionary instructions confined the jury's attention to the actual issues.

SAME (4-1). In such a case, an instruction that the defendant must be found not guilty unless the jury was satisfied that the loan was a loan from the S. Bank "and not a loan from some other bank" is not objectionable as adding an independent proposition which the jury must find.

CRIMINAL LAW (461)—SENTENCE—CRUEL OR UNUSUAL PUNISHMENT—VIOLATION OF BANKING LAWS. A jury's recommendation of leniency is no part of the verdict, in the sense that it is controlling on the court, the extent of the punishment being a matter wholly within the discretion of the court.

SAME (461). The supreme court will not assume that the trial court, in fixing the punishment, gave heed to improper argument of the prosecutor tending to counteract the effect of the jury's recommendation of leniency.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered January 9, 1922, upon a trial and conviction of a violation of the state banking act. Affirmed.

*Ellis, Fletcher & Evans, Remann & Gordon,* and *W. H. Abel,* for appellant.

*J. W. Selden, J. A. Sorley,* and *Rex S. Roudebush,* for respondent.

FULLERTON, J.—The appellant, Gustav Lindberg, was convicted of a violation of the state banking act,

and appeals from the judgment and sentence pro- nounced upon him.

The Scandinavian-American Bank of Tacoma was a banking corporation organized under the laws of this state. The appellant was a stockholder therein and a director thereof, and while such director borrowed from the bank, on his unsecured note, the sum of $13,000. The bank subsequently became insolvent and was taken over by the state banking officers for liquid- ation. The note was then unpaid, and was found pledged as security with other notes of the bank for a loan made to the bank by another banking corpora- tion. The particular provision of the statute which the appellant was charged with violating is found at § 3259, of Rem. Comp. Stat. [P. C. § 302], and reads as follows:

"No bank or trust company shall, nor shall any offi- cer or employee thereof on behalf of such corporation, directly or indirectly, loan any sum of money to any director, officer or employee of such corporation, un- less a resolution authorizing the same and approved by a majority of the directors, at a meeting at which no director, officer or employee to whom the loan is to be made shall be present, shall be entered in the corpo- rate minutes.

"Every director and officer of any bank or trust company who shall borrow or shall knowingly permit any of its directors, officers or employees to borrow, any of its funds in an excessive amount or in violation of the provisions of this section, shall be personally liable for any loss or damage which the corporation, its shareholders or any person may sustain in conse- quence thereof, and shall also be guilty of a felony."

The information on which the appellant was con- victed charges that the appellant, while a director of the bank named, borrowed the money therefrom with- out a resolution authorizing the same approved by a

majority of the directors of the bank at a meeting at which he was not present and entered in the corporate minutes of the bank.

Taking up the errors assigned in the order in which the appellant presents them, the first to be noticed is the assignment that the court erred in overruling his motion for a change of venue, or, in the alternative, to call in a judge from another county to try the cause. The appellant did not support his motion by his own affidavit, but filed therewith the affidavit of one of his attorneys only. This affidavit is uncontroverted and contains recitals from which it can be inferred that prejudice to some extent existed in certain parts of the county against the officers generally of the particular bank, and were the question one on which this court could exercise an independent judgment, we are free to say that it would be permissible to reach a conclusion different from that reached by the trial court. But the question is not one of the first instance in this court. By the express provisions of the statute (Rem. Comp. Stat. §§ 2018, 2019) [P. C. §§ 9397, 9398], the question is vested in the first instance in the discretion of the trial court, and we can review its ruling only for gross abuse. As we said in *State v. Welty*, 65 Wash. 244, 118 Pac. 9, and repeated in part in the later case of *State v. Wright*, 97 Wash. 304, 166 Pac. 645:

"It is apparent, from a reading of these sections, that the granting or denying of the change of venue is a matter resting entirely in the sound, judicial discretion of the trial judge. Such being the statute, the ruling of the trial court cannot be reversed upon appeal, unless the record contains some evidence of its gross abuse, or it is shown that the court's ruling was arbitrary. Such has been our holding whenever such a question has been before us. *McAllister v. Wash-*

*ington Territory,* 1 Wash. Terr. 360; *Edwards v. State,* 2 Wash. 291, 26 Pac. 258; *State v. Straub,* 16 Wash. 111, 47 Pac. 227; *State v. Champoux,* 33 Wash. 339, 74 Pac. 557.   Such also is the general rule in construing statutes of like import.   12 Cyc. 243.   The rule is not only based upon the statute, but is founded in reason. The trial judge is generally familiar with the local situation; he knows the prevailing sentiment of the people, in so far as it finds oft repeated expression; he knows all the facts and circumstances proper to be considered in determining the matter; he may know the persons who make affidavits suggesting undue excitement or prejudice and can properly estimate the weight to be given such affidavits.   A judicial discretion, exercised under such circumstances, should not be interfered with, unless its abuse is so clearly manifest as to call for reversal.''

Looking to the record, we find nothing warranting the holding that that court grossly abused its discretion.   In addition to the fact that it would seem, if the prevalent prejudice was widespread, a more extended showing of it could readily have been made, there is no showing that the appellant did not obtain an impartial jury; at least, nothing of the *voir dire* examination of the jury is in the record, nor is it shown that the appellant, in the selection of the jury, was compelled to exhaust his peremptory challenges.   The purpose of a change of venue is to secure to the accused a trial before an impartial jury, and if the record does not disclose affirmatively that the accused did not have such a trial, it is very persuasive of the fact that the trial court did not err in denying the change. The case from this court principally relied upon by the appellant—*State v. Hillman,* 42 Wash. 615, 85 Pac. 63—is much stronger in its facts than is the present case.   Not only was there a showing by an affidavit signed by some thirty persons, and, in addition, numerous newspaper articles showing a widespread preju-

dice against the accused, but this prejudice was reflected in the *voir dire* examinations of the jurors called to sit in trial of the cause.

The ruling on the second ground of the motion was also without reversible error. There was no affidavit of prejudice filed against the trial judge under the special statute (Rem. Comp. Stat., §§ 209-1, 209-2) [P. C. §§ 8546, 8547], nor any showing that the judge sitting was prejudiced against the accused as a matter of fact. Whether, therefore, the court would call in a judge from an outside county to hear the cause was wholly a matter within its discretion.

A demurrer to the information was filed and overruled, and the second assignment of error is based upon this ruling. The appellant argues that the prohibition of the statute cited is directed against an officer who loans the funds of the bank, and not against an officer who borrows such funds. But without pursuing the appellant's line of reasoning, it seems clear to us that the prohibition is directed against both of such officers. It will be noticed from the quotation of the section made that the legislature has divided it into two paragraphs. The first of these is directed against loaning the funds of the bank to its officers without certain requirements. The second, when stripped of its qualifying phrases applicable to other situations, reads as follows:

"Every director and officer of any bank . . . who shall borrow . . . any of its funds . . . in violation of the provisions of this section . . . shall . . . be guilty of a felony."

Clearly, to our minds, this is a provision directed against the borrowing officer, and makes him guilty of a felony if the borrowing is in violation of the provisions of the act. Contrary to the contention of the appellant, we are not persuaded that this construction

of the statute makes an officer of a bank guilty of a felony who is innocent of wrong. A director who applies for a loan from his bank is not, it is true, permitted to be present when the application is passed upon by the board of directors, but he is bound, nevertheless, to known the result of their action. It is a matter of record to which he has access. To fail to note it is negligence. The requirement is for the protection of the public, and it would be against the policy of the law to permit a director of a bank, in defense of a charge of felonious borrowing from his bank, to plead that he was erroneously informed of the action of the bank.

Nor was it necessary that the state allege and prove a financial loss as a result of the borrowing. By the terms of the statute, the crime is complete when the borrowing is consummated without a compliance with the statutory requirements; loss of the money borrowed is not an element of the offense.

The third assignment, and the one to which the arguments are principally directed, is that the court erred in the exclusion of evidence offered by the appellant material to his defense. The evidence on the part of the state showed that the loan was actually made by the bank in which the appellant was a director. The appellant offered testimony tending to show that he had no knowledge of this fact, and was led to believe, by the manager of the bank, that the fact was otherwise. Stating his offer in its most favorable light, in substance it is this: That, in the early months of the year 1920, he began negotiations with one Connelly to purchase certain timber land, the consummation of which would require him to pay Connelly a considerable sum of money, estimated then to be approximately $22,000, which sum he would be obligated to borrow;

that the bank in which he was director was curtailing its loans, and for that reason and for other reasons he did not wish to borrow from it; that the manager of the local bank had theretofore obtained loans for him from eastern banking houses, and as soon as his negotiations with Connelly had reached a point where he felt he would need the money, he went to the manager, stated the circumstances to him, and requested him to procure a loan for him, which the manager assured him could be done, and afterwards told him had been done; that he then closed the deal with Connelly, finding, however, when Connelly's titles were examined, that Connelly had title to only part of the land he contemplated purchasing, lessening by that much the contemplated purchase price; that he then went with Connelly to the bank, was told by the manager to give his commercial note—that is, a note payable to and endorsed by himself, and not a note payable to the bank —for the amount required, and pass it to the teller of the bank; that he did this and was given credit on the bank's books for the amount of the note, which sum he immediately checked out to Connelly. He further offered to testify that he did not then know, and did not learn until sometime afterwards, that the money was advanced to him out of the funds of the local bank.

The trial court sustained the objection to the testimony on the ground that the facts stated did not constitute a defense to the crime charged. It held that intent was not a necessary element of the crime; that, on the contrary, if there was an actual borrowing from the bank by the appellant while he was a director thereof without a compliance with the statutory requirements, the appellant was guilty of a violation of the

statute, notwithstanding he may have thought the money was obtained from another source.

Turning to the statute it will be observed that the term "knowingly" is not used in defining the offense; nor are apt words used from which it can be inferred that guilty knowledge was intended to be made an essential element of the crime. If, therefore, this element is to be found in the statute, it must be so for reasons apart from its literal wording.

With respect to intent as constituting an element of an offense, there is a well-recognized distinction between statutes denouncing as crimes acts *mala in se,* and statutes denouncing as crimes acts *mala prohibita.* In the former, generally speaking, intent is a necessary element, while in the latter it is not so. These principles are not, perhaps, of uniform application in either class, and, perhaps also, less so in the latter than in the former. But the courts generally hold that, where statutes falling within the latter class are in the nature of police regulations, are for the protection of the public, or are intended to promote the general welfare, intent is not a necessary element of the offense, unless the statute in express terms or by apt words so declares. We have ourselves followed this general rule.

In *State v. Nicolls,* 61 Wash. 142, 112 Pac. 269, Ann. Cas. 1912B 1088, the defendant was convicted of selling intoxicating liquors to an Indian of mixed blood, in violation of a statute prohibiting such sales. One of the defenses offered, but which the court rejected, was that the defendant did not know that the person to whom the sale was made was of mixed Indian blood. Answering this objection, we said:

"Nor does the lack of intent excuse the offense. While it is an axiom of the law that there can be no crime without criminal intent, there are many cases where the execution and enforcement of the law de-

mand that the intent be implied; a presumption flowing from the acts of the parties. This rule has been generally, although not quite universally, applied in the enforcement of statutes passed in aid of the police power of the state, where the word 'knowingly' or other apt words are not employed to indicate that knowledge is an essential element of the crime charged. In the statute before us no qualifying words are employed. One who sells, gives, or barters intoxicating liquor to an Indian or one of mixed blood, is guilty. The fact of selling being established, the law supplies the element of intent.

" 'In these cases there is a voluntary act which the party does at his peril, and he is not to be excused either by ignorance of the law or ignorance of the fact. Either kind of ignorance implies a fault, and it must be assumed that with due diligence the true character of the act could have been ascertained.' Freund, Police Power, 635, 636.''

In *State v. Burnam,* 71 Wash. 199, 128 Pac. 218, the defendant was convicted of the offense of having in his possession, with intent to sell and deliver, milk of a grade below the standard fixed by statute. He sought to exonerate himself by showing that he was not personally present when the wagon containing the milk left the dairy, and that his instructions were to keep the milk up to the standard fixed by law. We held this to be no defense, saying:

"This is a police regulation enacted for the protection of the public health, and the penalty is imposed without regard to any wrongful intention, in order to insure such diligence as will render a violation of the law practically impossible.''

In *State v. Cherry Point Fish Co.,* 72 Wash. 420, 130 Pac. 499, the defendant was informed against for violating a statute prohibiting the taking of fish in fish traps between certain hours in certain days of the week. In defense, the defendant sought to show that

it had not wilfully violated the statutes, but the trial court held this to be no defense, and instructed the jury that a specific intent to violate or evade the statute was not necessary to constitute an offense under it, but that it was enough if they found that the statute had been violated.    Concerning this question, we used this language:

"The appellants assail the instruction for a number of reasons, but we think it correct in principle.    It is not here denied, of course, that, where a specific intent is required by statute to constitute an offense, such specific intent is a part of the offense and must be alleged and proven before a conviction can be had.    But where the statute makes it an offense to do a particular thing, and, like the one before us, is silent concerning the intent with which the thing is done, a person commits the offense when he does the forbidden thing, even if he had no evil or wrongful intent beyond that which is implied from the doing of the prohibited act."

In *State v. Case,* 88 Wash. 664, 153 Pac. 1070, where the defendant, a road supervisor, was charged with falsifying his accounts with the county, it was held no defense to show that the county had received a real service for the charges made and that there was no wilful design on the part of the supervisor to violate the law or defraud the county.    In the course of the opinion it was said:

"Acts in which the public have a direct interest, those touching the peace, safety, security, or welfare of the citizenry as distinguished from individual interest are frequently made penal by statute.    In such cases, an intent to violate the law is implied from the fact of violation."

See, also: *Seattle v. Smythe,* 97 Wash. 351, 166 Pac. 1120, 79 Am. St. 939; *State v. Ferry Line Auto Bus Co.,* 99 Wash. 64, 168 Pac. 893.

Of the cases from other jurisdictions sustaining the rule that intent is not a necessary element in statutory crimes of this sort, the case of *State v. Henzell*, 17 Idaho 725, 107 Pac. 67, is illustrative. In that state the statute made it the duty of warehousemen taking grain in storage to give to the owner of the grain a warehouse receipt for the same, and made it a felony for the warehouseman to sell the grain without the written assent of the holder of the receipt. The defendant was indicted for a violation of the statute. On his trial he offered to show that, prior to the delivery of the grain by the depositor, he had a contract with him to purchase the grain, and had in fact purchased it, and that the receipt given was not intended as a receipt within the meaning of the statute, but was given only as an evidence of the amount of grain delivered under the contract of purchase. The trial court refused to admit the proffered evidence, and on the appeal its ruling was sustained. Speaking upon the question, the appellate court said:

"We next pass to the question of intent and the right of the defendant to introduce evidence tending to show that he had contracted to purchase this grain and that he thought he had a right to sell and dispose of it. The statute under which this prosecution is had (§ 1490) reads as follows:

" 'No person operating any warehouse, commission house, forwarding house, mill, wharf, or other place of storage, shall sell, hypothecate, ship, transfer, or in any manner remove, or permit to be shipped, transferred or removed beyond his custody and control, any grain, flour, wool or other produce or commodity for which a receipt has been given by him as aforesaid, whether received for storing, shipping, grinding or manufacturing or other purposes, without the written assent of the holder of the receipt.'

"It will be observed at once that the statute itself says nothing about the intent with which the person

acts.   It in no way deals with the subject of *intent*; it only deals with *acts*.   It says: 'No person operating any warehouse . . . shall sell . . . any grain . . . for which a receipt has been given by him . . . without the written assent of the holder of the receipt.'   This statute is evidently intended as an arbitrary statute, prohibiting the *act* itself irrespective of the intent with which the act may be committed.   If it were not arbitrary in its terms, it would be a practical nullity.   If a warehouseman, or his agent, could be permitted in every case to introduce evidence as to oral agreements and understandings and the intent with which he acted, the entire statute regulating the duties and responsibilities of warehousemen would be a dead letter, and merely directory in its practical workings and operations.''

In New York it is held that the general rule that criminal intention is the essence of crime does not apply to crimes which are so because of statutes.   *People v. D'Antonio,* 150 App. Div. 109, 134 N. Y. Supp. 657; *People v. Werner,* 174 N. Y. 132, 66 N. E. 667; *People v. West,* 106 N. Y. 293, 12 N. E. 610, 60 Am. Rep. 452.

In the first of these cases it was said:

''There is a well-recognized distinction between acts *mala in se* and *mala prohibita.*   Under the latter it is well settled that criminal intent forms no part or element of the offense.''

In the second of the cases, this language was used:

''The law on this subject seems to be that an act *malum prohibitum* is not excused by ignorance, or a mistake of fact when a specific act is made by law indictable irrespective of the defendant's motive or intent. . . .

''The general rule that the criminal intention is the essence of crime does not apply to such prohibited acts; . . .''

But it is argued on behalf of the appellant that there is a difference between the facts of the cited cases and

the facts of the appellant's case, and that this differ-
ence differentiates the applicable rule. The claim of
difference is that, in the cited cases, the several wrong-
doers intentionally and knowingly committed the act
constituting the wrong, while in the appellant's case
he did not intentionally or knowingly so commit it, but,
on the contrary, took the money in the belief that it
came from another ownership than the ownership of
the bank. But whether there is this difference between
the case before us and the cited cases, we shall not in-
quire, as we are not of the opinion that the difference
requires the application of a different rule. The ap-
pellant's act in borrowing the money was voluntary,
and in that sense intentional. He took it knowing that
it was at the time in the bank's possession. Manifest-
ly his situation is no different than it would have been
had he made a formal application to the bank for a
loan and had been told by the manager of the bank that
his application had been favorably acted upon, when
the fact was otherwise. His transaction was, in part
at least, with the bank, and as a director of the bank
he was bound to know whether the bank's part in the
transaction was legal or illegal. To repeat what we
said in *State v. Nicolls, supra*:

" 'In these cases there is a voluntary act which the
party does at his peril, and he is not to be excused
either by ignorance of the law or ignorance of the fact
Either kind of ignorance implies a fault, and it must
be assumed that with due diligence the true character
of the act could have been ascertained.' "

The statute is not without its purpose. Probably
the most potent single cause of bank failures is the
over-borrowing of bank funds by bank officers. It
was this evil the statute was intended to remedy. It
was intended to protect that part of the general public

who make banks the depositaries of their funds. To be effective in this regard the statute of necessity must be more or less arbitrary. If an officer of a bank who overborrows from his bank is permitted to plead in defense want of knowledge of his act, the statute will become a nullity. The difficulty of enforcing it will outweigh its benefit. The trial court, therefore, did not err in excluding the proffered testimony.

Under his fourth assignment, the appellant has grouped a number of matters occurring during the course of the trial which he urges as error. Many of these arose because of the differing view of the law taken by the court and by the appellant's counsel on the question just discussed, and these are met by our conclusion on that question. Those that are not so met we shall notice as briefly as the nature of the objection will permit.

While the appellant was on the stand as a witness in his own behalf, he testified that, on depositing the thirteen thousand dollar note in the bank, the credit was not noted in his passbook in which his deposits with the bank were usually noted. On his cross-examination, the state's counsel inquired of him whether he meant to state that no credit was given him on the bank's books at the time he deposited the note. Before he answered, his counsel interfered, saying that they had not made that contention; that there had been evidence from both sides that such a credit was given, and that the appellant's only contention was that the credit was not noted on the passbook. A colloquy then ensued between counsel, a part of which was as follows:

"Mr. Sorley: You will admit that the statement he received from the bank, the statement for the first of July shows a credit? Mr. Fletcher: I don't know anything about that. Mr. Sorley: Then you bring the

statement here tomorrow morning. Mr. Fletcher: I haven't got any statement. Mr. Sorley: Then Lindberg has."

After some further examination of the witness by the state's counsel, the appellant's counsel made the following statement:

"At this time, so as to save the record, I desire to object to Counsel Sorley's statement demanding of us to produce evidence in our possession in the presence of the jury, so that the objection will be in the record."

Thereupon the state's counsel withdrew the demand. The appellant's counsel then objected to any further statement of counsel because prejudicial, adding, "I simply note it in the record." The court thereupon directed that the objection be noted in the record, and instructed the jury to disregard the matter entirely.

In support of his claim of error based on these proceedings, the appellant relies upon the case of *State v. Jackson*, 83 Wash. 514, 145 Pac. 470. But the case does not support the principle for which it is cited. While a casual reading of the opinion might indicate that it was held reversible error for a prosecuting officer to make a demand upon a defendant in the presence of the jury for the production of a paper or document containing incriminating evidence against him without more, a more careful examination of the opinion will show that this was not its purpose nor intent. There, the demand was not only made, but it received the sanction of the trial court. The defendant was put to the hazard of either producing the incriminating evidence or submitting to the inference of guilt arising from his refusal to produce it. Such, also, is the purport of the cases cited by the court as sustaining the principle announced. Here, the facts are different. The demand made did not receive the sanc-

tion of the court.  On the contrary, the demand was
withdrawn when the objection was made, and the court
not only permitted its withdrawal, but expressly in-
structed the jury to disregard it.  To reverse the
judgment for the reason assigned, we must go much
farther than the cited case goes; we must hold that
a mere demand upon the defendant to produce an in-
criminating document, withdrawn upon objection and
repudiated by the court, is so far reversible error as
to be incurable other than by a cessation of trial and
the beginning over again before another jury.  It must
be an extreme instance where this is required, and we
are not persuaded that this is one.

The court gave the following instruction:

"Every bank and trust company organized and ex-
isting under the laws of the State of Washington, shall
be managed by not less than five directors, excepting
that a bank having a capital of $50,000.00 or less may
have only three directors.  These directors shall be
elected by the stockholders and hold office for one year
and until their successors are elected and have quali-
fied and these directors shall meet at least once each
month, and whenever required by the State Bank Ex-
aminer.  A majority of the board of directors consti-
tute a quorum for the transaction of business.  Im-
mediately upon election each director shall take, sub-
scribe, swear to and file with the examiner an oath that
he will, so far as the duty devolves upon him, diligently
and honestly administer the affairs of such corpora-
tion and will not knowingly violate or willingly permit
to be violated, any provision of law applicable to such
corporation, and that he is the beneficial owner in good
faith of the number of shares required by law and that
the same is fully paid, is not hypothecated or in any
way pledged as security for any loan or debt."

The objection to this is not that it is an incorrect
statement of the law, but is that it introduced elements
into the trial not in issue.  It is said that the evidence

disclosed that the business of the bank was conducted in loose and unbusiness-like methods, so loose and unbusiness-like in fact as to amount to an almost total failure to comply with the requirements of the law, and that to direct the jury's attention to the law in this respect was to permit them to find the defendant guilty of offenses for which he was not on trial.

But that this instruction has the vice the appellant imputes to it, we cannot agree. Its purpose was, no doubt, to make known to the jury something of the duties and obligations the law imposes upon a bank director so that they might have a better understanding of the nature of the offense with which the appellant as such director was charged, and in this view it is commendable rather than censurable. Nor can we conclude that the jury were in any way misled. The court was specially careful in stating the issues which the jury were to determine. It not only quoted the section of the statute on which the information was founded, and stated to the jury that the question in the case was solely whether the appellant had violated that particular section of the statute, but pointed out to them in specifically numbered paragraphs what facts they must find before they could return a verdict of guilty. He also gave to the jury a number of precautionary instructions, tending to confine their attention to the actual issues; for example, he told them that the solvency or insolvency of the Scandinavian-American Bank was not involved in the issues, and that the jury should not permit that fact to enter into their deliberations or to prejudice or influence them in any manner whatsoever; and specially told them that it was not a crime for a director of a bank to borrow money from the bank of which he is director, unless the borrowing is done in violation of the statute which

he had quoted to them. As a whole, the instructions were informative to the jury, and wholly fair to the defendant, and we cannot conceive that the appellant's conviction was due to any misunderstanding of them, or from any prejudice arising therefrom.

Another instruction against which complaint is made is the following:

"You are instructed that unless you are satisfied beyond a reasonable doubt from all the evidence that the transaction charged in the information was in fact a loan by the Scandinavian-American Bank of Tacoma and not a loan by some other bank acting through the Scandinavian-American Bank, then you must return a verdict of not guilty."

The objection to this is that it "required the jury to find beyond a reasonable doubt that the loan was from New York, whereas the law [is] and the instructions should have been that they must find beyond a reasonable doubt this was from the Scandinavian-American Bank." But we think the criticism unfounded. Clearly the instruction is that the jury must find beyond a reasonable doubt that the transaction charged in the information was in fact a loan from the bank named. That it is also a charge that they must find beyond a reasonable doubt that the loan was not from some other bank is, to our minds, a strained construction. The phrase "and not a loan by some other bank" is, as we read it, a parenthetical phrase, put in as explanatory of and for the purpose of emphasizing the principal thought, and is in no sense the assertion of an independent proposition necessary for the jury to find before they could return a verdict of not guilty.

A further contention is that counsel for the state abused their privileges in their arguments to the jury, but we have found nothing in the matters complained of that requires a new trial.

The jury returned with their verdict of guilty a signed statement asking that the sentence of the court imposed on the appellant "be tempered with extreme leniency." Later on when the appellant was called before the court for sentence, the appellant, through his counsel, urged the imposition of a fine as punishment, contending that the recommendation of the jury was a part of their verdict and should be heeded by the court. This was opposed by counsel for the state, and a penitentiary sentence was urged. The court sentenced the defendant to the penitentiary to serve an indeterminate term of from one to five years. It is urged that the sentence is in violation of the verdict, and is so far excessive as to amount to cruel punishment within the inhibition of the constitution. But the recommendation of the jury was no part of the verdict in the sense that it is controlling upon the court. (Rem. Comp. Stat., § 2172 [P. C. § 9389]; *State v. Arata*, 56 Wash. 185, 105 Pac. 227.) A trial court usually gives heed to the recommendation of the jury in this regard, and the trial court, no doubt, did so in this instance; but the duty to determine the manner and the extent of punishment, within the limits prescribed by the statutes, of course, rests wholly upon the court, and its discretion is not ordinarily subject to inquiry in this court.

But the appellant says:

"At that time [the time the appellant was brought before the court for sentence] the defendant urged consideration of the jury's recommendation and that to impose a penitentiary sentence would not be lenience, much less extreme leniency. In response to this, State's Attorney Sorley addressed the court urging a penitentiary sentence. He stated to the court that no consideration should be given to the jury's recommendation for extreme leniency because such recommendation was forced on the jury by one juror threatening

to hang the jury if such a recommendation was not made and signed by all the jurors. That the recommendation was against the judgment and wishes of all the jurors except one or possibly two. That sometimes one juror and sometimes two voted for acquittal and that in order not to hang the jury and to get a verdict of guilty the others were forced to sign the recommendation for clemency.

"He also stated that he had talked with the depositors of the bank, many of them, and they had told him they were willing to lose their deposits if Lindberg and the other directors and officers of the bank were sent to the penitentiary.

"Mr. Sorley further stated to the court that Lindberg and the other directors and officers of the bank had wrecked the bank and brought distress to this entire community. That if Lindberg was let off with a fine it would make a farce and mockery of the prosecution. That Lindberg should certainly be sent to the penitentiary.

"Defendant's attorneys took exception to Mr. Sorley's statements as an attempt to impeach the jury's verdict and to intimidate the court."

But clearly this court cannot give heed to arguments of this sort. It would be to presume that the trial judge was capable of being intimidated. Doubtless the trial judge listened to the state's attorney with the same patient courtesy that he listened to the appellant's counsel when they urged a contrary view, but it is inconceivable that his mature and trained mind was unduly influenced by what was said; at least, we cannot, without some other or different showing, so conclude.

The judgment is affirmed.

MAIN, C. J., PARKER, TOLMAN, HOLCOMB, PEMBERTON, MITCHELL, and BRIDGES, JJ., concur.