[No. 37893. En Banc. March 31, 1966.]

THE STATE OF WASHINGTON, *on the Relation of John J. O'Connell, as Attorney General, Appellant,* v. ALBERTSON'S, INC., *et al., Respondents.**

*Reported in 412 P.2d 755.

*The Attorney General, Donald McMullen* and *Eldon H. Reiley, Special Assistants,* for appellant.

*Keith, Winston & Repsold* and *Michael J. Cronin* (*A. L. Lyons,* of counsel), for respondents.

OTT, J.—In this action, the state sought to enjoin Albertson's, Inc., from selling whole-bodied fryer chickens and cut-up, packaged fryer chickens to its customers at prices below its cost.

The state contended that the prices of 29 cents a pound for whole-bodied and 33 cents a pound for cut-up, packaged fryer chickens, advertised on August 29, 1963, and continuing thereafter throughout the Labor Day weekend in the Walla Walla and Richland areas, were below Albertson's cost; hence, in violation of the Unfair Practices Act, RCW 19.90.

Albertson's answer denied that it had violated the Unfair Practices Act and alleged, as an affirmative defense, that, although its advertised prices were below its cost, the legislature had expressly authorized sales below cost when "made in good faith to meet the legal prices of a competitor." RCW 19.90.070, *infra.*

The cause was tried to the court. At the close of the evidence, the court entered the following findings of fact:

That on August 28, 1963, the defendants, Albertson's, Inc., and Harold Olofson, advertised and sold whole bodied fryer chickens and cut-up fryer chickens in the Walla Walla and Richland, Washington areas for 29 and 33 cents per pound, respectively; that the advertising referred to herein was newspaper advertising published in the Walla Walla Union Bulletin and the Tri-City Herald; that the defendants also sold fryer chickens at the aforementioned prices on August 29, 30, 31 and September 1, 1963, at their Walla Walla and Richland, Washington stores. Finding of Fact No. 2.

That the defendants' invoice cost of the chickens referred to in Finding of Fact II was 30½ cents per pound and the sales of those chickens at 29 cents per pound

whole bodied and 33 cents per pound cut-up were made below "cost" as that term is defined in R.C.W. 19.90.010 (Washington Unfair Practices Act). Finding of Fact No. 3.

That in the approximate two year period immediately prior to August 28, 1963, the defendants had been in contact with agents of the Washington Attorney General's office and of the Washington State Fryer Commission and that during such period the defendants were constantly being undersold by their competitors on fryer chickens. Finding of Fact No. 5.

That on August 14 and August 16, 1963, in the Richland, Kennewick and Pasco areas, I.G.A. and Safeway grocery stores, respectively, advertised and sold whole bodied fryers for 29 cents per pound; that I.G.A. operates grocery stores in Pasco and Kennewick, Washington; that Safeway operates stores in Pasco, Kennewick and Richland, Washington; that both I.G.A. and Safeway are business competitors of Albertson's, Inc.; that the Tri-Cities area of Pasco, Kennewick and Richland, Washington comprise one trade area; that on August 28, 1963, I.G.A. also advertised whole bodied fryer chickens in the Tri-City Herald for 29 cents per pound; that such chickens were sold by the I.G.A. stores in Pasco and Kennewick, Washington on August 28, 29, 30, 31 and on September 1, 1963 at the price of 29 cents per pound; that the Tri-City Herald is the only daily newspaper published in the Tri-Cities area and serves subscribers in Pasco, Kennewick and Richland, Washington. Finding of Fact No. 6.

That in Walla Walla, Washington, I.G.A. advertised and sold whole bodied fryer chickens at 29 cents per pound during the weekend commencing with July 24, 1963; that again during the Labor Day weekend, commencing with August 28, 1963 and extending through September 1, 1963, I.G.A. advertised and sold whole bodied fryer chickens in the Walla Walla, Washington area for 29 cents per pound; that the city of Walla Walla comprises one trade area; that the advertising referred to herein was done in the Walla Walla Union Bulletin which is the only daily newspaper serving the Walla Walla, Washington area; that I.G.A. and Albertson's, Inc. each have one grocery store in Walla Walla and that they are business competitors in the Walla Walla trade area; that Johnny's Market, another competitor of Albertson's, Inc. in Walla Walla, advertised and sold whole

bodied fryers for 29 cents per pound on the Labor Day weekend beginning with August 28, 1963. Finding of Fact No. 7.

That the defendants stated that they at all times considered the fryer chicken prices of their competitors legal prices for the alleged reason that no civil or criminal charges had been brought against such competitors under the provisions of the Unfair Practices Act; that at a meeting of defendant's officials on August 8, 1963 in McCall, Idaho, the defendants adopted a policy of meeting price competition on fryer chickens. Finding of Fact No. 9.

That prior to setting Albertson's, Inc.'s fryer chicken prices on August 14, 1963, for sales during the Labor Day weekend of 1963, the defendant, Harold Olofson, consulted with the meat managers of Albertson's Walla Walla and Richland stores, who in turn had reviewed and were familiar with past advertisements and prices of competitors on fryer chickens in the Walla Walla and Tri-Cities areas; that from past experience in the retail meat business, the defendant, Harold Olofson, was aware that the Labor Day weekend is one of the most popular times of the year for the sale of fryer chickens and that consumer demand for fryer chickens is high at that time of year; that based on past prices of competitors in the Spokane and Tri-Cities areas in early August, 1963 and in Walla Walla during late July, 1963, the defendant, Harold Olofson, determined that during the Labor Day weekend of 1963, in order to be competitive, Albertson's, Inc. should advertise and sell whole bodied fryer chickens for 29 cents per pound in those trade areas; that for those reasons and in a good faith endeavor to be competitive, the defendant, Harold Olofson, tentatively determined on August 14, 1963 that Albertson's prices on fryer chickens during the Labor Day weekend, 1963, would be 29 cents per pound on whole bodied fryers and 33 cents per pound on cut-up fryers. Finding of Fact No. 10.

That prior to the Labor Day 1963 weekend, the only 29 cents per pound fryer price in Walla Walla during the 1963 summer was that of one store, I.G.A. Sigman's over the weekend commencing July 24, 1963. The defendant advertised and sold fryers in Walla Walla over the weekend commencing August 7, 1963 at 33 cents per pound for whole bodied fryers. Finding of Fact No. 11.

When the defendants arranged to advertise fryers on Labor Day 1963, they did not positively know that a competitor would advertise whole body fryers at 29 cents per pound. Defendants did not have this knowledge until the newspapers carrying the ads had been published. Finding of Fact No. 12.

That the defendants' actions of advertising and selling fryer chickens over the Labor Day weekend in Walla Walla and Richland, Washington at 29 cents per pound whole body and 33 cents per pound cut-up produced injurious effects on competitors of defendants in both cities; that certain competitors were left with more than the usual amount of chickens unsold, which they had to sell at a sacrifice price or which spoiled; that in addition, other general anticipated trade in their stores was lost; that the defendants had no intent or design to cause injury to competitors in connection with their Labor Day 1963 advertisements and sales of fryer chickens nor had they any intent or design to injure, destroy or lessen competition by said advertisements and/or sales; that the defendants' actions in advertising and selling fryer chickens at that time and in those places was done in an endeavor made in good faith to meet the prices of their competitors on fryer chickens. Finding of Fact No. 14.

That the defendants' fryer chicken prices advertised and offered in the Walla Walla and Richland, Washington areas during the Labor Day weekend 1963 were competitive prices and were not destructive prices as far as defendants' competitors were concerned, and such prices did not have the tendency or effect of destroying or lessening competition in those areas at that time or subsequent thereto. Finding of Fact No. 15.

From the judgment denying the injunction and dismissing the action, the state has appealed.

The appellant asserts that there was insufficient evidence to sustain the trial court's finding that Albertson's had acted in good faith, and that the competitive price of 29 cents a pound was not shown to be a legal price; hence, Albertson's evidence did not bring it within the exception provided in RCW 19.90.070. We do not agree.

RCW 19.90.070 provides in part:

The provisions of this chapter shall not apply to any sale made:

. . . .

(4) *In an endeavor made in good faith to meet the legal prices of a competitor* as herein defined selling the same article or product, in the same locality or trade area, and in the ordinary channels of trade as herein defined . . . . (Italics ours.)

Albertson's evidence established that for some two years prior to the dates in question its competitors had sold fryer chickens at prices below its cost; that it had maintained its cost price and was continuously undersold; that it had numerous conferences and negotiations with representatives of the Washington State Fryer Commission and members of the Attorney General's staff without result, and that finally it decided to meet its competitors' established prices for whole-bodied fryer chickens, even though it must do so at a loss.

Albertson's evidence also established that on August 14 and 16, 1963, I.G.A. and Safeway stores had advertised and sold whole-bodied fryer chickens for 29 cents a pound in the Richland, Kennewick, and Pasco areas; that on August 28, 1963, I.G.A. stores advertised whole-bodied fryer chickens at 29 cents a pound in the Tri-City Herald and sold them at that price in Pasco and Kennewick on August 28, 29, 30, 31, and September 1, 1963; that I.G.A. stores advertised whole-bodied fryer chickens in the Walla Walla Union Bulletin at 29 cents a pound and sold them at that price in Walla Walla on July 24, 1963, and later during the Labor Day weekend from August 29 through September 1, 1963; and that Johnny's Market, another competitor of Albertson's in Walla Walla, advertised and sold whole-bodied fryers at 29 cents a pound during the Labor Day weekend, beginning August 28, 1963.

The evidence relating to Albertson's good faith further established that, even though I.G.A. had advertised whole-bodied fryer chickens at 29 cents a pound on July 24, 1963, Albertson's had maintained its price at 33 cents a pound.

The trial court's finding that Albertson's acted in good

faith in meeting the prices of its competitors is abundantly supported by the record.

Appellant's further contention that Albertson's failed to establish the legality of its competitors' prices finds no support in the record before us. The following transpired during the examination of one of Albertson's witnesses:

> THE COURT: Have you taken action against any of these other men who sold for 29¢ prior to this date? MR. REILEY: There is an injunction outstanding against Rosauer's. THE COURT: No, but I mean any of these Tri-City areas here. One of those stores on August—MR. REILEY: *I have investigated* myself, taken action in the Walla Walla area, *and concluded that it did not necessarily appear that the prices were illegal.* THE COURT: *At a 29¢ price?* MR. REILEY: *Yes, I would say so. There have been 29¢ prices that are legal* from time to time just— MR. CRONIN: Which ones, which dates? MR. REILEY: I can't tell you that without referring to—It's possible for the retailers to make good purchases and *sell legally at 29¢.* Of course, frequently these 29¢ ads are low-grade birds. (Italics ours.)

■ In the light of appellant's concession, made in open court, that the 29-cent prices of Albertson's competitors had been investigated and found to be legal, further evidence establishing the legality of the competitive prices was not necessary.

■ The trial court, commenting upon this issue in its memorandum opinion, stated that Albertson's "cannot be held to investigate the prices of their competitors . . . . It is doubtful if their competitors would give such information to them in any event; and thus, they're entitled to a *presumption that prices found on the open market are legal until otherwise shown.*" (Italics ours.)

The appellant's admission, together with the further evidence which established the presumption of legality of the prices offered by Albertson's competitors, sustains the trial court's finding of fact No. 9 in this regard.

■ In *Martin v. Aleinikoff,* 63 Wn.2d 842, 389 P.2d 422 (1964), we held that a sale below cost is not of itself sufficient to invoke the penalties of the Unfair Practices Act.

In *State v. Sears,* 4 Wn.2d 200, 217, 103 P.2d 337 (1940), which also involved an interpretation of the Unfair Practices Act, we said:

> We are therefore of the opinion that if a merchant in good faith reduces his prices to meet those of a competitor, *who he in good faith believes has a legal price,* he will not be violating either the intent or the wording of the act. (Italics ours.)

Accord, *People v. Pay Less Drug Store,* 25 Cal. 2d 108, 153 P.2d 9 (1944).

█ We have consistently held that presumptions are sufficient to establish a fact, but that these presumptions are rebuttable. *McGinn v. Kimmel,* 36 Wn.2d 786, 221 P.2d 467 (1950); *Gardner v. Seymour,* 27 Wn.2d 802, 180 P.2d 564 (1947).

If, by the above-quoted evidence, the state did not intend to concede the legality of Albertson's competitors' prices, it should have offered evidence to overcome the presumption that published prices of its competitors were legal prices. The appellant offered no such evidence.

We find no merit in either of appellant's contentions that the evidence was insufficient to sustain the trial court's findings of fact.

The trial court also predicated its decision upon Albertson's defense that its prices were not intended to and did not injure or destroy competition; hence, were not violative of the Unfair Practices Act, RCW 19.90.040.

We do not reach the merits of this defense for the reasons above set out.

The judgment is affirmed.

HILL, DONWORTH, WEAVER, and HAMILTON, JJ., concur.

HALE, J. (dissenting)—I dissent. The Attorney General, seeking to soften the devastating economic effects of unbridled competition induced by below cost selling in the fryer industry, invokes the Unfair Practices Act, Laws of 1939, ch. 221, p. 923, RCW 19.90, to halt the sale of fryer chickens at prices lower than Albertson's, Inc., paid for them.

I am fearful that the construction placed by the majority on this statute not only leaves the state without a law designed to curb unfair and cut-throat competition, but will make it nearly impossible to draw an enforceable law for this purpose in the future.

The evidence conclusively established that Albertson's knowingly, intentionally and purposely sold fryer chickens at retail in Walla Walla and Richmond for less than its invoice prices with no knowledge whatever that its competitors intended to offer the same products for sale at an equal or lower price. Having done so purposely, Albertson's ought not be heard to say that they sold at below cost without intent to damage competition or competitors, for such intentions are not elements of the violations charged. Having advertised fryers at below cost without any knowledge that competitors were or intended to do likewise in Walla Walla and Richland, Albertson's ought not be heard to say that they lowered their sale prices below cost in a good faith endeavor *to meet the legal prices of a competitor.*

Labor Day and the Fourth of July occupy a traditional niche in the grocery and meat industries as big days for fryer sales. August 28, 1963, as a part of its Labor Day sales activities, defendant Albertson's, Inc., through the individually named defendants, advertised whole-bodied fryers at 29 cents a pound and cut-up, packaged fryer chickens at 33 cents a pound in two daily newspapers, the Walla Walla Union Bulletin and the Tri-City Herald. It sold the fryers at these advertised prices as regular meat market items in its stores in Walla Walla and Richland on August 29, 30, 31 and September 1, 1963, knowing that the advertised prices were lower than the prices it had paid for the fryers.

Albertson's had purchased the fryers wholesale at 30½ cents a pound whole bodied for retail sale in its Walla Walla and Richland stores, but the cutting up and packaging cost another 4 cents per pound. Thus, even without adding on the other major expenses of doing business, its invoice price for fryers at its Walla Walla and Richland stores during the 1963 Labor Day sales came to 30½ cents whole bodied

and 34½ cents cut up—an invoice price substantially above the advertised, retail price in these two communities.

Acting in the name of the State of Washington, the Attorney General filed this suit against Albertson's, Inc., and several of its managing executives individually, to enjoin them from selling fryer chickens at less than defendant Albertson's cost thereof, and asked further that the cost of doing business (RCW 19.90.010) be computed at 15 per cent of the invoice price and added thereto. From a decree of dismissal entered upon findings of fact and conclusions of law April 14, 1964, the State of Washington now appeals. Unlike the majority, I find a basis for such an injunction in the Unfair Practices Act.

We are not concerned with the amount in money or percentage of the invoice price which should be added thereto as the cost of doing business under RCW 19.90.010, for the state does not raise that issue on this appeal. The Attorney General's case rests on the premise that, where positive evidence shows the merchant's selling price to be below his buying price, the state has proved prima facie a below cost sale in violation of the statute, and proving the cost of business merely buttresses an already clearly proved violation. Any defense to a deliberate below cost selling campaign must, he contends, to be tenable under the Unfair Practices Act, depend on a good faith endeavor to meet not only *legal* but *known* prices. I agree.

This review, therefore, covers only the legality of 1963 Labor Day sales at less than Albertson's invoice price in Walla Walla and Richland, *i.e.*, sales per pound below 30½ cents for whole-bodied and 34½ cents for cut-up fryers, and does not explore the state's earlier contention that, if the fair cost of doing business were added to the retail cost, the retail prices for the fryers would have been even more markedly below Albertson's costs of acquiring them.

*Intent to Injure Competitors or Destroy Competition.*

Sustaining the two principal defenses to this action, the trial court found (1) want of intent to injure competitors or damage competition and (2) an endeavor in good faith

to meet competition. The matter of intent or purpose should be considered first. Does the section of the statute under which this suit was brought require proof of an intent or purpose to injure competitors or destroy competition?'

Although the statute contains a number of repetitious and overlapping provisions, I am certain that the Attorney General brought this suit under the first and third clauses of Laws of 1939, ch. 221, § 4, p. 926, RCW 19.90.040, a section reading:

> It shall be unlawful for any person engaged in business within this state to sell any article or product at less than the cost thereof to such vendor, or give away any article or product, for the purpose of injuring competitors or destroying competition, or to use any article or product as a "loss leader," or in connection with any sale to make or give, or to offer to make or give, any special or secret rebate, payment, allowance, refund, commission or un-earned discount, whether in the form of money or otherwise, or to secretly extend to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, or to make or enter into any collateral contract or device of any nature, whereby a sale below cost is effected, to the injury of a competitor, and where the same destroys or tends to destroy competition. (Italics mine.)

The evidence showed a planned, calculated and intentional campaign of below cost sales in two distinct and widely separated trading areas falling, in my opinion, within the clause prohibiting sales at less than the vendor's cost and also constituting a "loss leader" prohibited in § 4 above, as defined in RCW 19.90.010.[1]

The majority relies in part on *Martin v. Aleinikoff,* 63 Wn.2d 842, 389 P.2d 422 (1964), but that case seems to me to come closer to sustaining appellant's position here than it does respondents'. There we did not have below cost sales or "loss leaders" but rather preferential secret rebates

---

[1] " 'Loss leader' means any article or product sold at less than cost as herein defined to induce, promote or encourage, the purchase of other merchandise, or which may have the tendency or capacity to mislead or deceive purchasers or prospective purchasers, or which diverts trade from or otherwise injures competitors;"

or discounts "not extended to all purchasers" of household fuel oil. We emphasized this in saying "The complaint *did not* allege that defendants had sold a product . . . 'at less than the cost thereof . . . .'" and the cause turns on the application of the fifth clause,

> or to secretly extend to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions . . . .

The instant suit, however, is brought under the first and third clauses of Laws of 1939, ch. 221, § 4, p. 926, RCW 19.90.040, which clauses contain no reference whatever to intent or purpose.

In *Martin v. Aleinikoff, supra,* we separated RCW 19.90-.040 into what appeared to be a sensible and logical structure for the purposes of interpretation, and concluded that a preferred reading of the section warranted that its first and third clauses be read independently to describe particular forms of proscribed business conduct among many covered elsewhere in the section. When so read, it appears that the instant action comes precisely under this first clause of § 4, that "It shall be unlawful for any person engaged in business within this state to sell any article or product at less than the cost thereof to such vendor . . . ." and under clause 3, prohibiting the use of any article or product as a "loss leader," with both clauses unconditioned by the subsequent language which qualifies other and different—though similar—forms of business conduct by requiring proof of an intent or purpose to injure competition or destroy competition.

That intent or purpose to injure competitors and destroy competition may be elements in violating some sections of the statute, does not necessarily imply that they are essential to a violation of all sections. Accordingly, Laws of 1939, ch. 221, § 6, p. 927 (RCW 19.90.060), as argued by defendants, declaring that proof of selling below cost or at discriminatory prices when combined with proof of the injurious effects thereof shall constitute presumptive evidence of the intent or purpose to injure competition and

competitors, lays down a rule for proving intent where the statute requires such intent, and does not accordingly indicate such intent to be an element in the clauses under consideration. Unless intent be an element of the offense, § 6 (RCW 19.90.060) of the statute does not apply.

In statutes and ordinances proscribing actions malum prohibitum, as distinguished from malum in se, intent generally need not be an element either in criminal or civil proceedings brought thereunder. *Ellis v. United States,* 206 U.S. 246, 51 L. Ed. 1047, 27 Sup. Ct. 600 (1907); *United States v. Dotterweich,* 320 U.S. 277, 88 L. Ed. 48, 64 Sup. Ct. 134 (1943); *Morissette v. United States,* 342 U.S. 246, 96 L. Ed. 288, 72 Sup. Ct. 240 (1952); and, similarly, *United States v. Gainey,* 380 U.S. 63, 13 L. Ed. 2d 658, 85 Sup. Ct. 754 (1965).[2] For example, proof of intent to injure is not a requisite to an action maintained under the Robinson-Patman Act, 15 U.S.C. § 13, which makes discriminatory pricing policies unlawful if the effect of such discrimination will substantially lessen competition. *Federal Trade Comm'n v. Henry Broch & Co.,* 363 U.S. 166, 4 L. Ed. 2d 1124, 80 Sup. Ct. 1158 (1960); *Atlas Bldg. Prod. Co. v. Diamond Block & Gravel Co.,* 269 F.2d 950 (10th Cir. 1959), *cert. denied,* 363 U.S. 843, 4 L. Ed. 2d 1727, 80 Sup. Ct. 1608; *Mid-South Distributors v. Federal Trade Comm'n,* 287 F.2d 512 (5th Cir. 1961).

Many of our decisions affirm the principle that intent need not be an element of offenses malum prohibitum. In upholding the judgment of conviction for violation of the state banking statutes, we said, in *State v. Lindberg,* 125 Wash. 51, 215 Pac. 41 (1923):

> With respect to intent as constituting an element of an offense, there is a well-recognized distinction between statutes denouncing as crimes acts *mala in se,* and statutes

---

[2] *United States v. Gainey, supra,* by implication, extends this rule to hold 26 U.S.C. § 5601(b)(2) constitutional in prosecutions for moonshining where the presence of the defendant at the site of the still during its operation "shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such presence to the satisfaction of the jury."

denouncing as crimes acts *mala prohibita*. In the former, generally speaking, intent is a necessary element, while in the latter it is not so. These principles are not, perhaps, of uniform application in either class, and, perhaps also, less so in the latter than in the former. But the courts generally hold that, where statutes falling within the latter class are in the nature of police regulations, are for the protection of the public, or are intended to promote the general welfare, intent is not a necessary element of the offense, unless the statute in express terms or by apt words so declares.

and adhered to this doctrine in *State v. Winger*, 41 Wn.2d 229, 248 P.2d 555 (1952); *State v. Huey*, 14 Wn.2d 387, 128 P.2d 314 (1942); *Seattle v. Gordon*, 54 Wn.2d 516, 342 P.2d 604 (1959).

Thus, in enacting laws to promote the general welfare or establish police regulations for public protection, or in authorizing the state to foster and preserve the public peace, health, safety and morals, in short, in defining conduct or actions malum prohibitum, the legislature may constitutionally omit intent, purpose or scienter as essential elements of the forbidden conduct. That reasonable regulations in the field of commerce, business and trade constitute a legitimate exercise of the police power and come within this constitutional principle may be seen in a survey of price regulatory statutes, state and federal. 2 CCH Trade Reg. Rep. ¶ 6500, *et seq.*

Since its enactment in 1939, the Unfair Practices Act has come before this court only twice directly, *Martin v. Aleinikoff, supra,* and *State v. Sears*, 4 Wn.2d 200, 103 P.2d 337 (1940), and once tangentially, *State ex rel. Pay Less Drug Stores v. Sutton*, 2 Wn.2d 523, 98 P.2d 680 (1940), in none of which were we required to pass on the validity and meaning of the first and third clauses of § 4 (RCW 19.90-.040), now under inquiry.

Those cases remind us that the Unfair Practices Act was enacted during or in the wake of a serious and prolonged economic depression of national and presumably world dimensions—an economic catastrophe probably in the mind of nearly every legislator then sitting. Among the many and

complex forces deepening the depression—whether of cause or effect courts cannot authoritatively say—had been the inexorable descending price spiral on consumer goods inducing selling below cost, which in turn incited further selling at less than cost with each wave of price cutting precipitating and accelerating anew the downward price spiral until thousands of businesses throughout the nation went into reorganization or oblivion. The legislature probably believed, with good reason, that many of these businesses suffered extinction, not through inefficiency or mismanagement but for the simple reason that a merchant cannot sell a large portion of his merchandise below invoice cost and survive.

The Unfair Practices Act was thus designed to exercise the state's police powers in the field of trade and commerce; to convert the predator into a competitor; to curtail the senseless and vicious practices inherent in cut-throat competition and to narrow the areas of competition so that every merchant would have at least a fair start in the race for business; to assure that every competitor began the competitive race at the point of selling his merchandise above cost, and thus reserving for the field of fair competition such activities as planning, buying, advertising, service, courtesy, credit, general efficiency and the multifarious skills inherent in the merchandising process.

Laws of 1939, ch. 221, § 15, p. 930 (RCW 19.90.910), declares that it shall be liberally construed to carry out its beneficial purposes.[3] Applying a liberal construction to the enactment leads me to the conclusion that the legislature intended by the first and third infinitive clauses (RCW 19.90.040) to prevent sales below invoice cost and the use of "loss leaders," regardless of intent or purpose, and that

---

[3]"The Legislature declares that the purpose of this act is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented. This act shall be liberally construed that its beneficial purposes may be subserved." Laws of 1939, ch. 221, § 15, p. 930, RCW 19.90.910.

omission of any references to an intent to injure competitors or damage competition in either clause was a purposeful omission done with a legislative design to eliminate such intent or purpose as a part of the *sine qua non* of the first and third clauses in RCW 19.90.040.

Knowledge of and intent to do the prohibited acts having been overwhelmingly established by the evidence, proof of intent or design to injure competitors or competition was not, therefore, under my understanding of this section, requisite to proving a violation thereof.

### *Good Faith Endeavor to Meet Competition*

The trial court sustained Albertson's affirmative defense that the below cost sales were made in a good faith endeavor to meet competition under Laws of 1939, ch. 221, § 7, p. 928, RCW 19.90.070(4).

Finding of fact 14 upholds the good faith endeavor in the following language:

> ■ that the defendants had no intent or design to cause injury to competitors in connection with their Labor Day 1963 advertisements and sales of fryer chickens nor had they any intent or design to injure, destroy or lessen competition by said advertisements and/or sales; [2] that the defendants' actions in advertising and selling fryer chickens at that time and in those places was done in an endeavor made in good faith to meet the prices of their competitors on fryer chickens.

But in my view there was no evidence to support such findings, particularly when the record shows that the below cost sales had been planned and arranged several weeks before they were to be made, with no competitors' prices or competition in mind.

Albertson's and its executive agents do not dispute that their Labor Day advertising and attendant sales of fryer chickens in Walla Walla and Richland were below invoice costs.

As a large grocery chain ranking 25th in sales nationally in 1963, and operating a total of 99 stores in Washington, Oregon, Idaho, Montana, Wyoming and Utah, and opening

new stores at the rate of 20 to 25 annually, the company should be deemed capable of identifying its competitors and competitive prices. Two of the four largest grocery chains in the United States were operating stores in many of the same trading areas as Albertson's.

Albertson's point to a series of conferences and negotiations with agencies concerned in the poultry industry to show its good faith and absence of damaging intent. They referred to a 2 year period preceding August 28, 1963, during which they had numerous conferences and negotiations with representatives of the Washington State Fryer Commission[4] and members of the Attorney General's staff. Finally, they concluded, the only way to meet the below cost selling was to engage in the same practice, and this decision, they say, impelled the very sales under scrutiny here.

But I regard the negotiations and general condition of the industry occurring prior to the violations largely as immaterial. We are dealing in this case with a specific selling campaign in two specific trading areas. Albertson's and its executives made no claim that any competitor in either Richland or Walla Walla had intimated it would sell at 29 cents on the Labor Day weekend. The company decided upon the below cost Labor Day sales in Walla Walla or Richland prior to August 14, 1963, when its meat supervisor for the Spokane district, of which Walla Walla and Richland were a part, planned the 29 cent price and arranged for the advertising. The court even found that the earlier sales by Albertson's competitors in Walla Walla and Richland had not occurred during any time "material to this action," and the record is devoid of proof that Albertson's thus acted in good faith to meet the *legal* prices of any known competition in the affected trading areas at the time they launched the very sales in issue.

Moreover, the court found affirmatively that the advertising and sales prices of 29 cents and 33 cents in Walla Walla and Richland did in fact have a markedly damaging

[4]See Washington Agricultural Enabling Act, RCW 15.66; Wash Adm. Code 16-512-020.

and injurious effect on competitors there. It found that these competitors were left with an extraordinary amount of unsold fryers which spoiled, or perforce had to be sold at a sacrifice, and that the competitors suffered a loss of other trade or business generally because of a diversion of their customers to Albertson's stores.

Good faith endeavor to meet competition, as I noted earlier, was claimed as an affirmative defense under Laws of 1939, ch. 221, § 7, p. 928, RCW 19.90.070 (4), a section defining transactions exempt from operation of the statute:

> The provisions of this act shall not apply to any sale made:
>
> . . . .
>
> (d) In an endeavor made in good faith to meet the *legal prices* of a competitor as herein defined selling the same article or product, in the same locality or trade area, and in the ordinary channels of trade as herein defined; or in an endeavor made in good faith by a manufacturer, selling an article or product of his manufacture, in a transaction and sale to a wholesaler or retailer for resale to meet the legal prices of a competitor selling the same or a similar or comparable article or product, in the same locality or trade area and in the ordinary channels of trade as herein defined. (Italics mine.)

The subjective standard that the sale be made in good faith has little meaning unless tested by the objective criteria prescribed in the same section. Objectively, then, to come under RCW 19.90.070 (4), (1) the sale must be made to meet the price of a competitor; (2) the prices sought to be met must either be *known* or in the exercise of reasonable prudence believed to be *legal* prices; (3) the prices must relate to the same article or product, (4) in the same trading area or locality, and (5) sold by a competitor in the ordinary channels of trade. On the defendants, therefore, rests the burden of showing that the below cost sales in Walla Walla and Richland fell within these five criteria. *People v. Gordon*, 105 Cal. App. 2d 711, 234 P.2d 287 (1951). When so tested, the *bona fides* claimed by Albertson's disappear.

A statute designed generally to promote the public welfare, or expressly prescribing a liberal construction, should

be liberally construed by the courts, but the converse is true of provisions therein setting up exemptions or exceptions to its operation. Exemptions should be given a narrow or constructive construction. *Spokane v. State*, 198 Wash. 682, 89 P.2d 826 (1939); 50 Am. Jur. *Statutes* § 431.

A narrow or constrictive interpretation then of RCW 19-.90.070(4) means that, if one has no knowledge either of the competitor's prices, or having such knowledge does not in the exercise of reasonable care believe they are legal prices, he is not acting in good faith. If the prices sought to be met are manifestly illegal, or to one in the exercise of reasonable prudence do not appear legal, or if one does not know what the prices are, a claim to meet them in good faith becomes a contradiction in terms because the very essence of good faith contemplates that the prices to be equaled must be both known and legal. Two wrongs do not make one right; and if the illegal price is offered to meet another illegal price, the transaction loses its claimed *bona fides* and the protection described in RCW 19.90.070(4) creating exceptions to the statute.

Construing RCW 19.90.070(4) in the liberal fashion employed by the majority rather than restrictively as required by the rule probably defeats the legislature's purpose in enacting the Unfair Practices Act—the very purpose courts are obliged to first discern and then give effect to. Giving to the exemptions a liberal interpretation allows two or more competitors to take their below cost sales out of the statute by each lowering his prices in turn below legal standards and thus inviting or forcing the remaining competitors to do likewise or suffer the economic consequences. One ought not be heard to say that he competed in good faith with an unknown competitor of whose prices he had no knowledge. Sales at illegal prices by others at earlier times do not excuse further violations in reprisal.

Defendants, after earlier planning, having on August 14, 1963, arranged to advertise the fryers below cost without knowledge of competitors' prices at 29 cents or less during the Labor Day weekend in Walla Walla and Richland, could

not, therefore, under RCW 19.90.070 (4) be regarded either as setting the prices in a good faith effort to compete or as seeking to meet *legal* prices.

Thus, I believe there was no evidence to sustain the court's finding of a good faith endeavor to meet in competition the legal prices of defendant Albertson's competitors. That finding, then, becomes a mere conclusion of law, and the court should be considered in error in upholding this affirmative defense.

One final observation: I think the foregoing analysis amply supports the view that Laws of 1939, ch. 221, § 4, p. 926, RCW 19.90.040, was a constitutional and valid exercise of the state's police and regulatory powers both in its terms and as sought to be applied in this case—a point raised in argument but not touched on by the majority.

The judgment should, in my opinion, be reversed with directions to enter the injunction prohibiting the sales of cut-up and whole-bodied chickens at below invoice cost.

ROSELLINI, C. J., FINLEY and HUNTER, JJ., concur with HALE, J.

---

September 14, 1966. Petition for rehearing denied.